[Civ. No. 57639. Second Dist., Div. Three. Jan. 22, 1980.]

TAUBER-ARONS AUCTIONEERS COMPANY, INC.,
Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent.
DOROTEO PEREZ, Real Party in Interest.

COUNSEL

Bolton & Gelbard, Robert A. Bolton and Herbert F. Blanck for Petitioner.

No appearance for Respondent.

Voorhies, Greene, O'Reilly, Agnew & Broillet, Timothy J. Wheeler and Al Schallau for Real Party in Interest.

OPINION

**POTTER, Acting P. J.**—Petitioner Tauber-Arons Auctioneers Company, Inc., seeks a peremptory writ of mandate to compel respondent Superior Court for the County of Los Angeles to vacate its order, granting the motion of real party in interest Doroteo Perez to specify an issue "without substantial controversy" pursuant to Code of Civil Procedure section 437c.

Perez is the plaintiff in the action entitled Perez v. Independent Crop Dusting Corporation, et al., case No. C 110988, which seeks damages for personal injuries allegedly suffered as the proximate result of a defect in a "Forsberg Model 101 'V' Belt Drive Planer." Perez suffered injury while operating the planer in the course of his employment with

Crystal-Like Plastics on or about March 19, 1974. The planer was acquired by Crystal-Like Plastics in February 1969, at an auction sale conducted by petitioner.

After discovery proceedings which disclosed the source of the machine, Perez moved the court for an order that it be "deemed established" that petitioner (1) "sold the subject product to the plaintiff's employer, Crystal-Like Plastics," (2) "is the 'seller' of the subject product," and (3) "[a]s 'seller' of the subject product...is subject to the rule of strict liability imposed on sellers of products."

In support of the motion, Perez relied upon the deposition of Bert Arons, the majority stockholder and secretary-treasurer of petitioner. The deposition showed that during the 18 years that Arons had been with petitioner, he had "been engaged exclusively in the business of auctioning off used machinery and equipment." Crystal-Like Plastics purchased the planer at a public auction sale of all of the factory machinery of Henry Engineering Company, a manufacturing concern which was going out of business. Included were a wide variety of different types of machines, such as automatic screw machines, lathes, milling machines, drills, band saws, grinders, compressors and forklifts which were manufactured by a large number of different manufacturers. There was only one wood planer and it was the only Forsberg product included.

Petitioner conducted the sale at Henry Engineering Company premises. Petitioner's compensation was a flat fee of $2,500 paid by Henry Engineering. The sale was advertised by petitioner through direct mail. The advertisement merely listed the items by manufacturer and model number and illustrated some of them. Petitioner's services also included cleaning up the machinery to make it more attractive to purchasers but petitioner did not do maintenance or repair and sold all equipment "as is." The title to all the machinery was transferred directly from Henry Engineering to the purchasers; this was petitioner's practice in 99 percent of the auctions which it conducted. Arons had never seen a Forsberg planer before and had no expertise as to its design.

In opposition to Perez' motion, petitioner relied upon the Arons deposition testimony and upon his declaration. The declaration stated that (1) "[a] substantial portion of [petitioner's] business activity is auction-

ing used industrial machinery," (2) petitioner did not take title to the planer but sold it as agent for Henry Engineering, (3) at the time of sale the planer was not a new machine and was sold "as is" "which in this trade means that said planer was not modified, altered, inspected, tested and/or operated by" petitioner and was, therefore, "subject to inspection by potential buyers prior to the date of auction," and "[n]o representations of any kind were made to anyone at any time regarding the safety or quality of the Forsberg planer."

In ruling on Perez' motion, respondent court restated the issue thereby presented in terms of the decision of our Supreme Court in *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal. Rptr. 896, 391 P.2d 168], which imposed liability upon a car dealer as an "integral part of the overall producing and marketing enterprise" engaged in the business of distributing Ford automobiles to the public. Respondent concluded that "[t]he totality of facts gleaned from the admissible evidence indicates that defendant auctioneer was a marketer, in the chain of commercial marketing of the defective planer, so as to be liable to plaintiff for product liability." On this basis, the court declared "that the following issue is without substantial controversy and is deemed admitted: that defendant Tauber-Arons Auctioneers, in auctioning the subject Forsberg Planer Machine, was engaged in the sale and distribution of said machine as a commercial marketer participating as an integral part of the business enterprise of marketing." The action was permitted to proceed "as to the issues remaining."

## Contentions

Petitioner contends that (1) mandate is an appropriate remedy because the order is not appealable and an appeal from an adverse judgment is not an adequate remedy; and (2) the showing made by Perez does not establish petitioner's status as a marketer subject to strict liability for defects in the Forsberg planer.

Respondent court has not filed a return.

Perez, as real party in interest, opposes the petition on the merits, claiming that the undisputed facts establish petitioner's strict liability for any defect in the planer.

## Discussion

*Summary*

Mandate is an appropriate remedy. The trial court erred in declaring that petitioner was, as a matter of law, a marketer subject to strict liability for any defect in the planer. A peremptory writ shall therefore issue, directing that said order be vacated.

*Mandate Is an Appropriate Remedy*

■ The result of the trial court's order is that petitioner is prevented from defending against Perez' cause of action for strict liability on any basis other than the nondefective nature of the planer and such order is not appealable. As stated in *Nazaroff* v. *Superior Court* (1978) 80 Cal. App.3d 553, 557-558 [145 Cal.Rptr. 657], "where an order bars a substantial portion of a [party's] case from being heard on the merits, a petition for writ of mandate to vacate that order may be maintained. (*Vasquez* v. *Superior Court* [1971], 4 Cal.3d 800, 807 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Field Research Corp.* v. *Superior Court* [1969], 71 Cal.2d 110, 111 [77 Cal.Rptr. 243, 453 P.2d 747].) [Fn. omitted.]"

We granted the alternative writ in this matter because the court below decided an important issue of first impression in this state which should be resolved by an appellate court decision.

*Petitioner's Status as a Marketer*
*Subject to Strict Liability*
*Was Not Established*

■ In reviewing an order declaring an issue "without substantial controversy" pursuant to Code of Civil Procedure section 437c, we are bound by the rules generally applicable to review of summary judgments. In *Nazaroff* v. *Superior Court, supra*, 80 Cal.App.3d at page 558, where such an order was under review, the court said: "The rules governing summary judgments are collated in *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412 [42 Cal.Rptr. 449, 398 P.2d 785]. There the court concluded, 'Thus, the trial court was justified in granting the motion here only if the declarations filed in support of it, strictly construed, contain facts sufficient to entitle the defendants to judgment, and those of the plaintiffs, liberally construed, show that

there was no issue of fact to be tried.' (62 Cal.2d at p. 417. See also *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 169 [95 Cal.Rptr. 623, 486 P.2d 151]; *Pettis* v. *General Tel. Co.* (1967) 66 Cal.2d 503, 505 [58 Cal. Rptr. 316, 426 P.2d 884]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 127-128 [109 Cal.Rptr. 724]; *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253 [79 Cal.Rptr. 723], *passim*; and *Thornton* v. *Victor Meat Co.* (1968) 260 Cal.App.2d 452, 457-458 [67 Cal.Rptr. 887]. Cf. *Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 588 [39 Cal.Rptr. 708, 394 P.2d 548]; *Arauz* v. *Gerhardt, supra,* 68 Cal.App.3d 937, 940-941 [137 Cal.Rptr. 619]; and *Swaffield* v. *Universal Ecsco Co.* (1969) 271 Cal.App.2d 147, 171-172 [76 Cal.Rptr. 680].)"

Consequently, in the absence of any showing to the contrary, we must assume (as a fact favorable to petitioner) that the alleged defect in the Forsberg planer was created by the original manufacturer, Forsberg. At the time petitioner participated in the sale to Crystal-Like Plastics, the planer was secondhand, having been used by Henry Engineering Company in its manufacturing activities.

■ Petitioner was shown to have been engaged for many years in the business of conducting auction sales of used machinery of all categories, generally (as in this case) as agent of the owner. Though petitioner advertised the sale and cataloged the items being offered, it made no recommendation nor representation of the merit of any manufacturer's product. Moreover, there was no showing whatever that petitioner occupied any special position with respect to Forsberg; Forsberg was simply one of the innumerable machinery manufacturers whose products might be auctioned secondhand by petitioner. In fact, Arons had never even seen a Forsberg planer before.

The effect of the trial court's ruling is to make every dealer in secondhand goods strictly liable for defects created by innumerable manufacturers of the class or classes of products with which he may deal. The real issue in this case is whether the policy of the doctrine of strict liability established by the decisions of the appellate courts in this state justifies the imposition of strict liability under such circumstances.

Neither party to this proceeding claims that there are any California precedents squarely dealing with this issue. Real party, as did the trial court, relies upon several cases which have extended strict liability of

the manufacturer of a defective product to include all others who "are engaged in the business of distributing goods to the public" as "an integral part of the overall producing and marketing enterprise" for the product in question. (*Vandermark v. Ford Motor Co., supra,* 61 Cal.2d at p. 262.) In *Vandermark,* the Ford dealer who retailed the defective vehicle was held strictly liable. Subsequent cases have extended liability to a variety of different participants in various capacities in the initial distribution of the particular product to the public. These authorities are summarized in the opinion of division five of this district in *Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, 724 [101 Cal.Rptr. 314], as follows: "The following entities besides the manufacturer, obviously the principal one, have been found to be integral components of the particular enterprise responsible for placing alleged defective products on the market: a lessor (*McClaflin v. Bayshore Equipment Rental Co.,* 274 Cal.App.2d 446 [79 Cal.Rptr. 337] [stepladder] and *Price v. Shell Oil Co.,* 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722] [gasoline truck]); a developer (*Kriegler v. Eichler Homes, Inc.,* 269 Cal.App.2d 224 [74 Cal.Rptr. 749] [a builder engaged in mass tract development of homes]); a licensee (*Garcia v. Halsett,* 3 Cal.App.3d 319 [82 Cal.Rptr. 420] [a launderette owner who was said to have licensed the use of a washing machine to plaintiff]); a retailer (*Vandermark v. Ford Motor Co., supra,* 61 Cal.2d 256 [retailer of a defective automobile]); and a wholesale-retail distributor (*Barth v. B. F. Goodrich Tire Co.,* 265 Cal.App.2d 228 [71 Cal.Rptr. 306] [who merely distributed tires from his stock on order of the manufacturer]). [Fn. omitted.]"

In *Kasel,* the American firearms company whose Mexican trademark licensee and affiliate manufactured and sold defective shotgun shells in Mexico was held an integral part of the marketing enterprise which sold the shells. Referring to the above authorities, the court further said (*id.,* at p. 725): "The above listed cases have stressed that under the stream-of-commerce approach to strict liability no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability. It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system)

which calls for imposition of strict liability. (*Garcia v. Halsett, supra*, 3 Cal.App.3d 319, wherein the court stated (at p. 325): 'The precise legal relationship between the parties has not played a particularly significant role in the cases imposing strict liability.')"

Two significant aspects of the above statements require emphasis. The first is that the defendant's particular legal relationship is not determinative. Thus, the fact that in this case petitioner acted as an agent in the conduct of the sale is not controlling. If a manufacturer of modern "antiques" chose to market them exclusively through an "estate" auctioneer as its agent, such auctioneer patently would be a participant "in the manufacturing-marketing system." What is significant, however, is the second aspect—the requirement that defendant have a participatory connection with the enterprise which "created consumer demand for and reliance upon" the particular "injury-producing product" (*ibid.*), not just products of the same classification. In *Kasel*, it was the defendant's participation in the enterprise which distributed and created consumer demand for "Remington Express" shot shells. In each of the other cases cited, the relevant market in which the defendant was deemed a participant was the initial distribution to the consuming public of the particular defective product of a given manufacturer.

For example, in *Vandermark*, it was the Ford dealer's participation on a continuing basis in the initial distribution and marketing of Ford automobiles. In *Garcia v. Halsett* (1970) 3 Cal.App.3d 319 [82 Cal.Rptr. 420], the launderette operator who maintained four rows of coin-operated washing machines manufactured by Philco-Bendix in continuous operation for public use, was held liable as a marketer, the court observing (*id.*, at p. 326): "Although respondent is not engaged in the distribution of the product, in the same manner as a manufacturer, retailer or lessor, he does provide the product to the public for use by the public, and consequently *does play more than a random and accidental role* in the overall marketing enterprise of the product in question." (Italics added.) In *Barth v. B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228 [71 Cal.Rptr. 306], the wholesale and retail distributor was engaged in a continuous distribution activity in respect of Goodrich tires. Likewise, in *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722], the court took pains to point out that defendant "was engaged in an organized and continuing operation" (*id.*, at pp. 254-255) of leasing a particular model of tank truck "'built to a set of standard plans of Shell Oil Company'" (*id.*, at p. 255, fn. 9) so

that the lease of that particular equipment "was not an isolated or occasional transaction" (*id.*, at p. 255).

The above California cases make it clear that the marketing enterprise, participation in which would justify imposition of strict liability for a defect created by the manufacturer, is the enterprise by which initial distribution of the particular manufacturer's products to the consuming public is effected. Such authorities do not, therefore, support imposition of strict liability in the case at bench where the only connection between petitioner and Forsberg products is its "random and accidental role" (*Garcia* v. *Halsett, supra,* 3 Cal.App.3d at p. 326) in transferring the planer from one consumer to another. Petitioner's participation in the auction transaction as agent for Henry Engineering Company was more comparable to the role of Paper Mate Manufacturing Company in respect of the defective machinery which injured plaintiff in *Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633 [105 Cal.Rptr. 890]. Balido's employer bought the allegedly defective plastic injection molding press, secondhand, from Paper Mate, the original consumer. In affirming a judgment of nonsuit in favor of Paper Mate, division two of this district said (*id.*, at pp. 639-640): "On strict liability, there was nothing to suggest that Paper Mate was a conduit for the production or distribution of Improved's presses. Paper Mate was no more than a one-time 'occasional seller' who does not become subject to strict liability for manufacturing or design defects. (*Silverhart* v. *Mount Zion Hospital*, 20 Cal.App.3d 1022, 1026 [98 Cal.Rptr. 187]; Rest.2d Torts, § 402A, com.f.)"

The only California case we have found which imposed strict liability upon the seller of used machinery is *Green* v. *City of Los Angeles* (1974) 40 Cal.App.3d 819 [115 Cal.Rptr. 685]. Plaintiff was injured by a defective secondhand crane sold by Link-Belt to the city. In upholding the liability imposed upon Link-Belt, the court said (*id.*, at p. 838): "Under the findings of the court which recite the extensive modifications which Link-Belt made in the crane prior to the sale to the City, Link-Belt in our view was tantamount to a manufacturer insofar as liability here is concerned. (*Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)" No such basis for imposition of liability was shown in the case at bench.

There are no California cases dealing with the question whether a defendant who is in the business of selling secondhand products, who has

not modified or rebuilt them, is strictly liable for defects in their original manufacture or design. We must look, therefore, for guidance in this respect in the decisions from other jurisdictions and in the policy of this state which underlies the extension of strict liability not only to manufacturers but to all those who participate as "an integral part of the overall producing and marketing enterprise" of the product in question. (*Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d at p. 262.)

Though there is a paucity of out-of-state precedent, there are cases upholding, as well as cases denying, strict liability of secondhand dealers. The authority most nearly in point, however, withholds imposition of strict liability upon dealers in used goods under circumstances not excluded by real party's showing in this case. The policy considerations upon which this holding is based are consistent with those which underlie our doctrine. We consequently find it appropriate to adopt such holding as the rule in this state.

A case upholding strict liability is *Turner* v. *International Harvester Company* (1975) 133 N.J.Super. 277 [336 A.2d 62]. A secondhand dealer, who sold a tractor-truck manufactured by International Harvester Company, was denied a summary judgment by the Superior Court of New Jersey. The truck, a 1967 model, was sold in 1969 "as is." In 1971, while the purchaser was working on the engine, he was killed when the cab, which was raised to give access, suddenly collapsed and fell upon him. The court assumed for the purpose of the motion that the truck had some defect which caused the cab to fall. However, the moving papers did not show whether the origin of the defect was the original manufacturer or was subsequent modification, dilapidation or misuse. The basis upon which summary judgment was sought was the disclaimer of warranty in the "as is" sale. In denying the motion, the court held applicable the rule of strict liability stated in Restatement Second of Torts, section 402A, which imposed liability upon the seller of "'any product in a defective condition *unreasonably dangerous* to the user or consumer....'" (*Id.*, at p. 67.) (Italics added.) This test was held properly applicable to used goods which, in respect of their safety, failed to meet the "reasonable expectations of buyers of used goods." (*Id.*, at p. 69.) The court added in this respect: "With this 'unreasonably dangerous' element intact, the Restatement rule is as applicable to the sale of a used product as to the sale of a new product." (*Id.*, at p. 71.) Since plaintiff might establish that the truck was "unreasonably dangerous" by this standard, e.g., by showing that, contrary to such

"justifiable expectations," the counterbalance or prop was so worn, abused or modified as to be ineffective, albeit originally properly designed, a summary judgment was held inappropriate. The justification for the imposition of such liability was stated purely in terms of risk-spreading based upon the assumed ability of sellers of used goods to pass on their cost of doing business, as follows (*id.*, at p. 69): "We will first consider whether this is the type of case for the application of strict liability in tort. An economic analysis of enterprise liability, which includes direct as well as indirect costs, would charge those in the business of selling a defective product with responsibility for all harms, physical and economic, which result from its use. Baxter, 'The SST: From Watts to Harlem in Two Hours,' 21 Stanf.L.Rev. 1 (1968); Coase, 'The Problem of Social Cost,' 3 J. Law & Econ. 1 (1960). To a considerable extent—with respect to *new* goods—the manufacturer bases the cost of his product on his expenses, which include damages caused by the product and insurance to cover those damages. This cost is spread among all the customers for that product; it reflects the justifiable expectations of customers regarding safety, quality and durability of new goods. Sellers of used goods may similarly distribute their costs of doing business which, in turn, *will reflect what is considered by the public to be justifiable expectations regarding safety, quality and durability of used goods.*" (Italics added.)

The rule stated in *Turner* might be applicable to petitioner in this case if the planer failed to meet the public's "justifiable expectations regarding safety, quality and durability of used goods" (*ibid.*)[1] as a result of modification, dilapidation or misuse. There is nothing in the record, however, to show that the defect relied upon is such as to render the planer defective on this basis. It may well have been in exactly the same condition as it was when new, in which event it is difficult to conceive how it could fail to meet justifiable expectations as to used goods which, at best, are only as safe as they were when new.

In *Tillman* v. *Vance Equipment Co.* (1979) 286 Ore. 747 [596 P.2d 1299], the Oregon Supreme Court specifically considered the question of the liability of a seller of used machinery "for a defect in a used crane when that defect was created by the manufacturer." (*Id.*, at

[1]The "unreasonably dangerous" test has been rejected in California as a necessary factor. (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 135 [104 Cal.Rptr. 433, 501 P.2d 1153].) However, failure to satisfy "ordinary consumer" expectations is still a basis for strict liability under California law. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 435 [143 Cal.Rptr. 225, 573 P.2d 443].)

p. 1301.) The defendant, a "used equipment dealer" (*id.*, at p. 1300), purchased a used crane and immediately resold it "as is" to plaintiff's employer. Plaintiff was injured while attempting to grease the gear box and claimed that the design of the box was defective. The trial court judgment for defendant was affirmed. The court noted the decision of the New Jersey Superior Court in *Turner* as an example of a decision making risk-spreading the controlling consideration in the imposition of enterprise liability. After stating that it had never been willing to rely solely on this element, the Oregon Supreme Court continued in *Tillman* (596 P.2d at pp. 1303-1304): "Instead, we have identified three justifications for the doctrine: '...[C]ompensation (ability to spread the risk), satisfaction of the reasonable expectations of the purchaser or user (implied representational aspect), and over-all risk reduction (the impetus to manufacture a better product)...' *Fulbright* v. *Klamath Gas Co.*, 271 Or. 449, 460, 533 P.2d 316, 321 (1975).

"While dealers in used goods are, as a class, capable like other businesses of providing for the compensation of injured parties and the allocation of the cost of injuries caused by the products they sell, we are not convinced that the other two considerations identified in *Fulbright* weigh sufficiently in this class of cases to justify imposing strict liability on sellers of used goods generally.

"Our opinions have discussed, on other occasions, what we called in *Fulbright* the 'implied representational aspect' of the justification for strict products liability. In *Heaton* v. *Ford Motor Co.*, 248 Or. 467, 435 P.2d 806 (1967), both the majority and the dissent indicated that at least in some cases it was for the jury to decide what degree of safety the average consumer of a product expects. However, in *Markle* v. *Mulholland's Inc., supra*, 265 Or. 259, 509 P.2d 529, a majority of the court agreed that the question was not solely a factual one. The plurality opinion says:

"...It is an expectation which is the result of the manufacturer's or seller's placing the article in the stream of commerce with the intention that it be purchased. This expectation is given legal sanction by the law through an assumption that the seller, by so placing the article in the stream of commerce, has represented that the article is not unreasonably dangerous if put to its intended use.' 265 Or. at 268, 509 P.2d at 532. This representational aspect, the opinion continues, '...is one of limitation in an attempt to keep [the expansion of strict liability doc-

trine] within manageable and logical bounds and to keep the liability from being absolute.' *Id.*

"By identifying this purpose of limitation we recognized that the court's role in defining the kinds of cases in which the law will permit a jury to find an expectation of safety serves a policy function. See, also, id. at 293-294, 509 P.2d 529 (Denecke, J., dissenting) and *Cornelius* v. *Bay Motors, supra,* 258 Or. at 581-582, 484 P.2d 299 (O'Connell, C. J., concurring).

"We consider, then, whether the trier of fact may infer any representation as to safety from the sale of a used product.

"We conclude that holding every dealer in used goods responsible regardless of fault for injuries caused by defects in his goods would not only affect the prices of used goods; it would work a significant change in the very nature of used goods markets. Those markets, generally speaking, operate on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it (by, for example, providing a guarantee, limiting his stock of goods to those of a particular quality, advertising that his used goods are specially selected, or in some other fashion). The flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.

"We are of the opinion that the sale of a used product, without more, may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce.

"As to the risk-reduction aspect of strict products liability, the position of the used-goods dealer is normally entirely outside the original chain of distribution of the product. As a consequence, we conclude, any risk reduction which would be accomplished by imposing strict liability on the dealer in used goods would not be significant enough to justify our taking that step. The dealer in used goods generally has no direct relationship with either manufacturers or distributors. Thus, there is no ready channel of communication by which the dealer and the manufacturer can exchange information about possible dangerous

defects in particular product lines or about actual and potential liability claims.

"In theory, a dealer in used goods who is held liable for injuries caused by a design defect or manufacturing flaw could obtain indemnity from the manufacturer. This possibility supports the argument that permitting strict liability claims against dealers in used goods will add to the financial incentive for manufacturers to design and build safe products. We believe, however, that the influence of this possibility as a practical factor in risk prevention is considerably diluted where used goods are involved due to such problems as statutes of limitation and the increasing difficulty as time passes of locating a still existing and solvent manufacturer.

"Both of these considerations, of course, are also obstacles to injured parties attempting to recover directly from the manufacturer. However, although the provision of an adequate remedy for persons injured by defective products has been the major impetus to the development of strict product liability, it cannot provide the sole justification for imposing liability without fault on a particular class of defendants.

"For the reasons we have discussed, we have concluded that the relevant policy considerations do not justify imposing strict liability for defective products on dealers in used goods, at least in the absence of some representation of quality beyond the sale itself or of a special position vis-à-vis the original manufacturer or others in the chain of original distribution. Accord: *Rix* v. *Reeves*, 23 Ariz.App. 243, 532 P.2d 185 (1975). [Fns. omitted.]"

As regards defects created by the original manufacturer, *Tillman* states a sound rule limiting liability of dealers in used equipment. Under the rule as stated, a Cadillac dealer who promotes the sale of new Cadillacs by offering "near new trade-ins" which are represented as "specially selected" may incur liability in respect of an original design defect in a car which he did not originally sell, both as a participant in the enterprise that created consumer demand and by generating "the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce." (*Id.*, at p. 1304.) The ordinary used products dealer, however, will not be strictly liable for such defects created by the manufacturer.

The rule stated in *Tillman* is consistent with the policy underlying the doctrine of strict liability as developed in this state and most recently announced by our Supreme Court in *Price v. Shell Oil Co.*, *supra*, 2 Cal.3d 245. In holding the volume lessor of tank trucks strictly liable for defects in the equipment provided therewith, the court stated that "the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." (*Id.*, at p. 251.) The court did not, however, abandon all other considerations. In particular, it affirmed the continued vitality of the requirement that the imposition of liability "works no injustice to the defendants," saying in this respect (*id.*, at pp. 253-254): "However, since we reason by analogy, we make clear that the doctrine should be made applicable to lessors in the same way as we have made it applicable to sellers. In *Greenman* [v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 (27 Cal.Rptr. 697, 377 P.2d 897)] *supra*, we fastened liability on a manufacturer 'when an article *he places on the market*,...proves to have a defect....' (59 Cal.2d at p. 62, italics added.) In *Vandermark* we again emphasized the necessity for a continuous course of business as a condition to application of the rule: 'Retailers like manufacturers are *engaged in the business* of distributing goods to the public....Strict liability...works no injustice to the defendants, *for they can adjust the costs of such protection between them in the course of their continuing business relationship.*' (61 Cal.2d at pp. 262-263.)"

The ordinary used machinery dealer has no continuing business relationship with the manufacturer in the course of which he can adjust the cost of protection from strict liability. Consequently, the rationale which underlies *Vandermark* simply is inapplicable to such a dealer. Moreover, the risk reduction which was sought in *Vandermark* on the assumption that "the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end" (61 Cal.2d at p. 262), as pointed out by the opinion in *Tillman*, is simply unattainable because the "used-goods dealer is normally entirely outside the original chain of distribution of the product...."[2] (*Tillman v. Vance Equipment Co.*, *supra*, 596 P.2d at p. 1304.)

---

[2]This circumstance also increases the potential for injustice if dealers in used products are subjected to strict liability in respect of original design defects as plaintiffs now need only show proximate causation between design and injury, whereupon defendants have the burden of proof to justify the design under the risk benefit standard.

The Oregon rule limiting liability of secondhand dealers in respect of defects created by the original manufacturer is, therefore, consistent with the public policy which underlies the California strict liability doctrine.

Accordingly, we conclude that it was not appropriate for the trial court to declare that petitioner, *as a marketer*, was strictly liable on account of any defect in the Forsberg planer. Should the defect relied upon be a design defect created by the original manufacturer, the facts so far adduced would support nonliability for they show that petitioner had no special position vis-à-vis the original manufacturer and in fact played no more than a random and accidental role in the distribution of the Forsberg planer. It is unnecessary to decide whether petitioner may be strictly liable if the defect proven is the result of subsequent modification, dilapidation or misuse.

The petition is granted. Let a peremptory writ of mandate issue commanding respondent court to set aside and vacate its order of October 1, 1979, determining that the issue of petitioner's liability as a marketer of the Forsberg planer is without substantial controversy, and to enter an order denying real party's motion for such an order.

Cobey, J., and Allport, J., concurred.

The petition of real party in interest for a hearing by the Supreme Court was denied March 20, 1980. Mosk, J., was of the opinion that the petition should be granted.

---

(*Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d at p. 435.) Ordinary used dealers normally lack access to the information necessary to meet this burden.