791 P.2d 1303

**Kenneth M. PETERSON,**
**Plaintiff–Appellant,**

v.

**The IDAHO FIRST NATIONAL BANK,**
**Defendant–Respondent.**

No. 17991.

Supreme Court of Idaho.

May 10, 1990.

Ringert, Clark, Harrington, Reid, Christenson & Kaufman, Boise, for plaintiff-appellant. Andrew M. Harrington, argued.

Hall, Farley, Oberrecht & Blanton, Boise, for defendant-respondent. Phillip S. Oberrecht, argued.

BAKES, Chief Justice.

This is a products liability action. The appellant (Peterson) brought suit against respondent Idaho First National Bank (IFNB), claiming that the used mobile home he had purchased from IFNB was in a defective condition and unreasonably dangerous and, as such, caused Peterson and his wife to suffer illness (the illness stemmed from an alleged emission of a high formaldehyde concentration from the mobile home). The district court entered summary judgment in favor of IFNB on the grounds that a commercial seller of used products is not subject to strict liability. in tort.

In March of 1984, the plaintiff, Kenneth M. Peterson, and his wife purchased on credit from IFNB a used mobile home which IFNB had financed and then repossessed. Prior to selling the repossessed mobile home to Peterson, the bank repaired the exterior skirting, cleaned the interior, and checked and winterized the water pipes. There is no evidence that it performed any repair, reconditioning or modification which would affect the level of formaldehyde emissions in the home. There also is no evidence to show that the bank was aware that the home had an unacceptable level of formaldehyde emissions or that the bank performed any inspection or tests that would show the presence of formaldehyde emissions.

After paying for two years, Peterson defaulted on the payments on the note he gave to purchase the mobile home, and the bank sued on Peterson's note and foreclosed its security interest in the mobile home. In defending that action, Peterson alleged failure of consideration due to alleged high formaldehyde levels in the mobile home which made it uninhabitable. The district court entered judgment in the court trial for the bank in the foreclosure action, finding that the contractual defenses of revoca-

tion of acceptance and failure of consideration were not proven by Peterson. No appeal was taken by Peterson from the judgment entered in that case.

On August 11, 1987, the plaintiff filed the instant action, alleging various physical ailments which were caused by the "uninhabitable condition of the mobile home purchased from defendant." The plaintiff alleged the mobile home had been tested and found to contain a high concentration of formaldehyde. The plaintiff alleged he suffered "illness, lingering weakness, and emotional distress caused by the uninhabitable condition of the mobile home purchased from defendant."

On May 12, 1988, the district court granted partial summary judgment in favor of the bank on the plaintiff's claims for breach of implied warranties and denied summary judgment with respect to the plaintiff's remaining tort theory of strict product liability. The bank subsequently renewed its motion for summary judgment on the strict liability theory, and the district court granted the bank's renewed motion for summary judgment on the grounds that a commercial seller of used products is not subject to strict liability in tort in Idaho. The district court predicated its decision upon decisions from California and Oregon which hold that the relevant policy considerations do not justify imposition of strict liability for dangerously defective products on dealers in used goods. *Wilkinson v. Hicks*, 126 Cal.App.3d 515, 179 Cal.Rptr. 5 (1981); *Tillman v. Vance Equipment Co.*, 286 Or. 747, 596 P.2d 1299 (1979).

The single issue in this appeal is whether under either the statutes or the common law in Idaho a commercial seller of used products is subject to strict liability for the products it sells. This is the first occasion for this Court to address this question.

Respondent Idaho First National Bank argues, in support of the trial court's judgment in its favor, that both the common law of Idaho, and the statutes of the State of Idaho preclude the imposition of strict liability in tort upon the seller of used products. Respondent particularly points to the Idaho Product Liability Reform Act, I.C. § 6–1402(1), which specifically provides that, "The term 'product seller' does not include: ... (b) a commercial seller of used products...." The appellant, on the other hand, argues that common law liability should be extended to commercial sellers of used products and that the statute is inapplicable.

We look first to the common law claim. In *Shields v. Morton Chemical Co.*, 95 Idaho 674, 518 P.2d 857 (1974), this Court first applied the concept of strict liability adopted in the Restatement (Second) of Torts, Section 402A. In *Shields*, a seed company brought suit against the manufacturer of a defectively manufactured pesticide it had used to treat seeds. Recognizing that strict liability applied to the *manufacturer* of the pesticide, our holding did not go on to discuss the applicability of strict liability of a non-manufacturer-seller of a used product.

In *Rindlisbaker v. Wilson*, 95 Idaho 752, 519 P.2d 421 (1974), we extended the concept of strict liability in tort to the defective design of a product, as distinguished from the defective manufacturer claims in *Shields*. However, as in *Shields*, we did not address in *Rindlisbaker* the application of 402A beyond the confines of the facts of that case, which was the liability for defective design of a product. Since *Shields* and *Rindlisbaker* were decided, no subsequent case in Idaho has raised the issue of whether strict liability extends to the sellers of used products.

Not having addressed this issue in Idaho, we turn to the rulings of our sister states for guidance. There is currently a split of authority on the question. On the one hand, some jurisdictions have imposed strict liability on sellers of used products. *See, e.g., Turner v. International Harvester Co.*, 133 N.J.Super. 277, 336 A.2d 62 (1975); *Hovenden v. Tenbush*, 529 S.W.2d 302 (Tex.App.1975); *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies*

*Co.*, 135 Ariz. 309, 660 P.2d 1236 (App. 1983); and *Thompson v. Rockford Machine Tool Co.*, 49 Wash.App. 482, 744 P.2d 357 (Wash.1987). Conversely, other courts have refused to extend strict liability to sellers of used products. *See, e.g., Wilkinson v. Hicks*, 126 Cal.App.3d 515, 179 Cal.Rptr. 5 (1981); *Tillman v. Vance Equipment Co.*, 286 Or. 747, 596 P.2d 1299 (1979).

■ Despite the conflicting results obtained by the various jurisdictions, most states generally concur that, in the absence of a statute resolving the issue, the resolution of this question hinges upon a common law analysis of the policies that underpin the doctrine of strict liability and whether those policies are promoted by applying the doctrine to sellers of used products. In *Tillman v. Vance Equipment Co.*, 596 P.2d 1299 (Or.1979), the Oregon Supreme Court identified three justifications for adoption of strict liability. They are: (1) compensation or ability to spread the risk (enterprise liability); (2) satisfaction of the reasonable expectations of the purchaser or user (implied representational aspect); and (3) overall risk reduction (the impetus to manufacture a better product). With respect to the concept of spreading the risk, the *Tillman* court stated:

> While dealers in used goods are, as a class, capable like other businesses of providing for the compensation of injured parties and the allocation of the cost of injuries caused by the products they sell, we are not convinced that the other two considerations ... weigh sufficiently in this class of cases to justify imposing strict liability on sellers of used goods generally.

596 P.2d at 1303. Appellant argues that the concept of spreading the risk expressed in comment c to Section 402A, Restatement (Second) of Torts, is the primary policy behind strict liability, and that this Court, in applying Section 402A in *Shields* and *Rindlisbaker* necessarily adopted comment c. We disagree. The application or adoption of any section of the Restatement in a given case does not necessarily include all the comments thereto. As pointed out in *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297 (1987), we will review each comment on a case by case basis, as the occasion arises, to determine if such comment warrants incorporation into the common law of Idaho. We have expressly rejected portions of the Restatement when it did not fit the needs of Idaho jurisprudence. *Idaho Bank & Trust v. First Bancorp*, 115 Idaho 1082, 1084, 772 P.2d 720, 722 (1989) ("We decline to adopt the *Restatement* standard," [regarding liability of a professional for negligent misrepresentation].). Moreover, while spreading the risk may have been one of the policy considerations in the Restatement Second's adoption of strict liability, we did not declare that to be our reason for adopting strict liability in *Shields* and *Rindlisbaker*.

■ With respect to the implied representational aspect of strict liability, we think it apparent that, unlike the market for new products, the prevailing custom in the used product industry is that the seller does not offer, and the buyer does not expect, either express or implied representations of quality. As the Oregon court in *Tillman* explained:

> Those markets, generally speaking, operate on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it....

596 P.2d at 1303. Appellant urges us to find fault in the aforementioned analysis, and follow the contrary reasoning set forth by the court in *Turner v. International Harvester Co.*, 336 A.2d 62 (N.J.1975). The *Turner* court stated:

> As suggested by the court in *Realmuto* [*v. Straub Motors*, 65 N.J. 336, 322 A.2d 440 (1974)] ... realistic expectations of quality and durability will be lower for used goods, commensurate with their

age, appearance and price. However, safety of the general public demands that when a used motor vehicle, for example, is sold for use *as a serviceable motor vehicle* (and not as junk parts), absent special circumstances, the seller be responsible for safety defects whether known or unknown at the time of sale....

336 A.2d at 69. In our view the foregoing statement of the New Jersey court in *Turner* is internally inconsistent, unrealistic and inaccurate. If the purchaser of a used product has a lowered expectation as to the quality and durability of the product, how can it be reasonable to expect no reduction in the standard of safety demanded? A purchaser of used products from a person other than the manufacturer expects that the seller of the used product will not have personal knowledge of the product's design or manufacture, and will not have the same ability as the manufacturer to guard against those kinds of defects. Additionally, the purchaser of a used product will recognize that the commercial seller of such used products may have no information regarding how the product was used or whether it has been abused in its prior use. The average consumer is doubtless aware that products erode through use and the inevitable passage of time, and that the quality, durability, and safety of the product undergo a corresponding decline. But foremost, the purchaser of a used product will not expect that the commercial seller of the used products will be informed either as to the safety of the design or of defects in the manufacturing process.

Finally, regarding the risk reduction policy behind strict liability, the position of the seller of used products is not, like the manufacturer, distributor, and retailer, part of the original distribution chain of the product. As the *Tillman* court stated,

> The dealer in used goods generally has no direct relationship with either manufacturer or distributors. Thus, there is no ready channel of communication by which the dealer and the manufacturer can exchange information about possible dangerous defects in particular product lines or about actual and potential liability claims.

596 P.2d at 1304. Theoretically, of course, a used dealer could obtain indemnity from the manufacturer, where the manufacturer is known and the defect in question can be traced to the manufacturer. But as the *Tillman* court stated with respect to this possibility, "[A]s a practical factor [the] risk prevention is considerably diluted where used goods are involved due to such problems as statutes of limitation and the increasing difficulty as time passes of locating a still existing and solvent manufacturer." 596 P.2d at 1304.

We therefore conclude that the policy considerations underlying the doctrine of strict liability do not justify imposing that doctrine as a common law rule on commercial sellers of used goods.

We next turn to the question of whether I.C. § 6–1401 *et seq.*, the Idaho Product Liability Reform Act (IPLRA), has any bearing on this issue.

Respondent argues that the IPLRA expressly precludes the imposition of strict liability on the sellers of used products. Respondent bases his argument on the definition of product seller set forth in I.C. § 6–1402(1). That section reads:

(1) "Product seller" means any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor, or retailer of the relevant product.... *The term "product seller" does not include:*

....

(b) A commercial seller of used products who resells a product after use by a consumer or other product user, provided the used product is in essentially the same condition as when it was acquired for resale

....

(Emphasis added.) The district court concluded that the statute was not applicable, but nevertheless arrived at the same result on the basis of the court's common law analysis. The district court based its conclusion that the statute was inapplicable upon its comparison of the Idaho Act with the Uniform Products Liability Act, upon which the Idaho Act was modeled for the most part. The district court stated that the Idaho Act "is not intended to affect the liability of sellers of used products under the common law of the individual states," based upon the following excerpt from the comments of the drafters of the UPLA contained in 44 Fed.Register 62718 (1979):

> It is also the intent of the drafters that this Act include manufacturers and other product sellers of new or remanufactured products, but not ordinary commercial sellers of used products ... Therefore, the issue of the potential liability of sellers of used products is left for resolution not under this Act, but rather under the other law of the state.

The statement in the comment that it is "the intent of the drafters that this Act include manufacturers and other product sellers of new or remanufactured products, but not ordinary commercial sellers of used products," is inconsistent with the next statement that "[t]herefore, the issue of the potential liability of sellers of used products is left for resolution not under this Act, but rather under the other law of the state." We find the contradiction in the drafting comment unexplained and inexplicable. However, we need not attempt to reconcile the inconsistency within the comment. The language which the Idaho legislature considered and adopted was the language contained in the statute, I.C. § 6–1402(1)(b), not the language in the comment in the Federal Register. The language in I.C. § 6–1402(1)(b) is clear and unambiguous and excludes the "commer-cial seller of used products" from the definition of a product seller under the Idaho Act. Thus, even though our primary holding today is that, under the common law of Idaho, there is no strict liability in tort to a commercial seller of used products, that conclusion is supported by the obvious intent of the Idaho legislature when it enacted I.C. § 6–1402(1)(b).[1]

I.C. § 6–1401, entitled "Scope," states: "The previous existing applicable law of this state on product liability is modified only to the extent set forth in this act." As already noted, there was no "previous existing law" with respect to the liability of sellers of used products, and therefore the Idaho Act was not modifying the existing common law in Idaho even though I.C. § 6–1401 contemplates that existing common law would be modified to the extent that it was inconsistent with the Act. The previous existing law, *i.e.*, strict liability and its embodiment in Section 402A, had only been applied to the manufacturer, distributor, and retailer. Accordingly, the IPLRA neither expands nor limits the scope of the common law. We simply conclude that under the Act, a "commercial seller of used products" is not a "product seller." From this statement it is clear that legislative policy recognizes that dealers of used goods are not in the same position and should not be treated the same as sellers of new products, *i.e.*, manufacturers, distributors and retailers. This interpretation of I.C. § 6–1402(1)(b) is consistent with our holding that, under the common law of Idaho, strict liability does not extend to the commercial seller of used products who sells the used product "in essentially the same condition as when it was acquired for resale."

The judgment of the district court is therefore affirmed. Costs to respondent.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

---

1. We are reluctant to attach too much significance to the comments to the UPLA because our legislature did not adopt the uniform act in its entirety, but only selected provisions therefrom. The aforementioned contradiction stems from a provision analyzing the UPLA; however, as Idaho did not adopt the Act in its entirety, the comments to the UPLA are not dispositive in interpreting the IPLRA.

BISTLINE, Justice, dissenting.

Chief Justice Bakes is to be commended for an excellent opinion. He correctly observes that "[s]ince *Shields* and *Rindlisbaker* were decided, no subsequent case in Idaho has raised the issue of whether strict liability extends to the sellers of used products.... Not having addressed this issue ... we turn to the rulings of our sister states for guidance." 117 Idaho at 725, 791 P.2d at 1304 (1990). This is as it should be.[2]

He first observes in this regard that there is a split of authority on the question, citing to the authority where strict liability has been imposed, and citing to converse authority. Included in the latter, of course, is Oregon's *Tillman v. Vance Equipment Co.*, 596 P.2d 1299 (Or.1979), and California's *Wilkinson v. Hicks*, 126 Cal.App.3d 515, 179 Cal.Rptr. 5 (1981). Other prominent California cases entitled to mention are *LaRosa v. Superior Court*, 122 Cal.App.3d 741, 176 Cal.Rptr. 224 (1981), and *Tauber–Arons Auctioneers Co. v. Superior Court*, 101 Cal.App.3d 268, 161 Cal.Rptr. 789 (1980). When we heard oral argument and also had the benefit of the clerk's record and the briefs of the parties, it was my expectation that the Court would lean toward the Oregon authority, if it proved sound, and toward California's *Wilkinson* case, which had made the choice to align with *Tillman*. The *casual* reader of Chief Justice Bakes' opinion should be convinced that it is soundly based, and two members of the Court were readily brought to join it.

A careful review of the *Tillman* case, however, and the California cases which followed it, disclose that *Tillman*, if understood and properly applied to the facts of *this* case, require that the summary judgment be vacated and the issue at the least be submitted to a jury, although judgment of liability as a matter of law might be proper.

Judge Carey is to be commended for the succinct and forthright eloquence of his opinion. He lets his reader know at once that the defendant bank is, and he so holds, "a commercial dealer in mobile homes, based on the substantial number of sales transactions it had consummated." R. 102. To my mind that *holding* necessarily should bear heavily on the decision which this Court reaches. A commercial dealer which deals only in slightly used mobile homes, but on an extensive basis, is far better positioned to profit from its venture than is the entrepreneur who—without the assets and available finances within the easy reach of the defendant bank—opts to enter the business of selling new mobile homes.

Judge Carey, as it turns out, was 100 percent correct in writing: "I believe that Idaho would follow the decisions of jurisdictions such as California and Oregon that the relevant policy considerations do not justify imposition of strict liability for dangerously defective products, on dealers in used goods, *in the absence of circumstances* making the dealer tantamount to a manufacturer." R. 103. The Idaho Supreme Court quickly did go with Oregon, and did not pause to consider the cautioning phrase which I have italicized.

On the other hand, had the case come up before the Court of Appeals, it is not unlikely that the case would have been decided differently. And correctly. There is simply no sound rationale for handing to the bank such a windfall as it receives here, and certainly not on the flimsy basis upon which this decision is being made. Positioned as it was, the bank was able to make substantial sums on the financing interest which it charges, whereas normal dealers in the business of retailing mobile homes make only their mark-up. Here the bank finances, then obtains the financed property itself at foreclosure, and then comes in for yet another bite of the same

---

**2.** That issue was not involved in *Shields* or in *Rindlisbaker*. In both of those cases the in-volved goods were not used, but new.

golden apple when a new purchaser is found—here the luckless Petersons.

That may be said to be attributable to the good and bad luck of the business world. But, where is the justification for a holding that when, as here, a bit of bad luck surfaces in that the golden apple comes up spoiled with the contamination of formaldehyde—up to that point undetected—the bank is granted judicial immunity from the liability which would without question attach to any other comparably sized or smaller vendor of new mobile homes? The bank's immunity is based simply on the slender premise that the mobile home when sold by the bank was not 100 percent new merchandise, but slightly used (but yet of such value that it commanded a $40,000.00 purchase price, and finance charges of 15 percent).

Judge Carey, as did Chief Justice Bakes, observed that there was no guiding authority to be found in Idaho and naturally looked to neighboring or nearby states— still finding very little. The two cases which he reviewed, *Wilkinson v. Hicks*, 126 Cal.App.3d 515, 179 Cal.Rptr. 5 (1981), and *Tillman v. Vance Equipment Co.*, 596 P.2d 1299 (Or.1979), are instructive, but far from compelling, and definitely not of much persuasion. The *Wilkinson* case, the most recent, also applied "two very recent cases," one of which was Oregon's *Till-*

*man* case,[3] and it also largely relied upon yet two other California cases, *LaRosa v. Superior Court*, 122 Cal.App.3d 741, 176 Cal.Rptr. 224 (1981), and *Tauber–Arons Auctioneers Co. v. Superior Court*, 101 Cal.App.3d 268, 161 Cal.Rptr. 789 (1980). In *LaRosa*, a petition for rehearing was denied, and hearing by the California Supreme Court was denied—*with three justices dissenting.*[4] In *Tauber–Arons*, the California Supreme Court also denied a hearing. All of the California cases fell in line with Oregon's *Tillman* case. In reality, then, there is scant *new* thought in what has been written since *Tillman*. In short, there is, as Judge Carey so viewed, no sound body of law to turn to for guidance.

But, be that as it may, there is good reason for not weighting very heavily *Tillman* and the California cases which utilized it. First of all, none of those cases concerned a bank heavily involved in financing mobile home transactions and thereafter acquiring the mobile homes for itself in foreclosure proceedings, and thereafter gaining the judicial beneficence of immunity from liability which a majority of the Court is all too willing to bestow— which it does without any display of having delved into a novel issue not heretofore reached by this Court. Second, and equally important, exactly what was involved in the California cases and the Oregon case? It

---

**3.** The *Wilkinson* court did not directly rely upon or cite to *Tillman*. As a matter of curiosity, the name "Tillman" does not appear anywhere in the *Wilkinson* opinion. *Tillman* crept surreptitiously into *Wilkinson* in connection with the latter's discussion of the California *Tauber–Arons* case:

Quoting from a decision by the Oregon Supreme Court, the [*Tauber–Arons*] court stated: ' "We conclude that holding *every* dealer in used goods responsible regardless of fault for injuries caused by defects in his goods would not only affect the prices of used goods; it would work a significant change in the very nature of used goods markets. Those markets, generally speaking, operate on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. If a buyer wants some assurance of quality, he typically either bargains for it in

the specific transaction or seeks out a dealer who routinely offers it (by, for example, providing a guarantee, limiting his stock of goods to those of a particular quality, advertising that his used goods are specially selected, or in some other fashion). The flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.

We are of the opinion that the sale of a used product, without more, may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce." ' (*Id.*, 101 Cal. App.3d at p. 281, 161 Cal.Rptr. 789).

*Wilkinson*, 179 Cal.Rptr. at 8, 126 Cal.App.3d at 515. One can only wonder at *Wilkinson's* failure to identify *Tillman* by name.

**4.** There are seven justices on the California Supreme Court, as is also true of the Oregon court.

is sincerely believed that if Judge Carey had been as much concerned here as he was in predicting which way this Court would go, the opinion which he would write, if not subjected to higher review, would have achieved a result favorable to the Petersons.

## FACTUALLY IT IS ILLOGICAL TO ANALOGIZE THIS CASE TO *TILLMAN.*

*Tillman* did not involve anything so mundane as a slightly used mobile home. And we have not, until today, ever thought of mobile homes as being inherently dangerous products. The same may not be said, however, of a twenty-four-year-old crane, the defective condition of which caused the injuries suffered by Buddy Tillman, the plaintiff in the Oregon case. It may be noted that the Oregon court was not quick to take the opportunity of releasing the seller of the used crane from liability; and, it is very likely indeed that had Justice Lent participated in the opinion, 'twould have gone otherwise.

A bank financing mobile homes on such a scale that it has repossessed, obtained title thereto and resold *over one thousand* such units has seemingly brought itself into a "special position ... in the chain of original distribution." Also, is it not equally true that when the bank in turn sells its thusly acquired mobile home for *$40,000,* such amounts to a "representation of quality." Especially where, as in the Petersons' case, the plaintiffs' deposition testimony was directly on point, corroborative, and unrefuted:

> Q. Would you tell the court the circumstances leading up to the purchase of the mobile home that is involved in this case.
>
> A. Yes. I called Gerry George and asked him if he had a repo mobile home, and he said, 'Yes, as a matter of fact, I do.'
>
> He said, 'I got a beautiful one over on the lot, and you will buy it if you look at it,' and so—

R. 57.

These circumstances, plus the unidentified quotations set forth above, fit neatly into the holding of the Oregon court, the main part of which has heretofore eluded the attention of the majority, namely "representation of quality" and "special position":

> For the reasons we have discussed, we have concluded that the relevant policy considerations do not justify imposing strict liability for defective products on dealers in used goods, *at least in the absence of some representation of quality beyond the sale itself or of a special position* vis-a-vis the original manufacturer or others in the chain of original distribution. Accord: *Rix v. Reeves,* 23 Ariz.App. 243, 532 P.2d 185 (1975).

*Tillman,* 596 P.2d at 1304 (emphasis added). Earlier on, the Oregon court had written in that opinion:

> The flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.
>
> We are of the opinion that the sale of a used product, *without more,* may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce.

*Id.* at 1303–04 (emphasis added) (footnote omitted). Even earlier the Oregon court wrote at length, quoting Justice Traynor in *Vandermark v. Ford Motor Co.,* 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964), and Justice Schaefer in *Dunham v. Vaughan & Bushnell Mfg. Co.,* 42 Ill.2d 339, 247 N.E.2d 401 (1969), for the proposition that:

> 'The strict liability of a retailer arises from *his integral role in the overall producing and marketing enterprise* and affords an additional incentive to safety.'
>
> Moreover, if a jurisdiction has adopted the principle of strict liability on the basis of enterprise liability, the liability of the seller of *either* a new or used product would logically follow.

*Tillman,* 596 P.2d at 1302 (emphasis added), quoting with approval to *Dunham v.*

*Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401 (1969). No one can with any sincerity assert that the bank did not play an integral role in the marketing of mobile homes, in general, and particularly in regard to the Petersons' acquisition of the Marlette. Without financing, very few mobile homes would find buyers. Moreover, the financing in and of itself is a lucrative business, with almost no exposure of loss for banks, which make it matter-of-course to repossess and outright own the security.

The product in *LaRosa*, 122 Cal.App.3d 741, 176 Cal.Rptr. 224, was a sixteen year old forty-five ton punch press capable of crushing both hands of an operator because of its defective condition. The product in *Tauber–Arons*, 101 Cal.App.3d 268, 161 Cal.Rptr. 789, was a planer. But the California court succumbed to its reading of *Tillman*, 596 P.2d 1299, although it acknowledged the holdings of *Vandermark*, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168, and distinguished it successfully. The product in *Wilkinson*, 126 Cal.App.3d 515, 179 Cal.Rptr. 5, another punch press, "was more than 50 years old," and had been purchased for a paltry $750 in March of 1972, which price the defendant Hicks doubled on resale, part of the increase being for labor in a change from a foot treadle to a dual palms control. All of the example cases were isolated sales of ancient heavy machinery, much of which was retired, but not yet discarded, and also having inherent market value as scrap iron. Really, now, need much more be said as to those antique iron monuments to which *stare decisis* effect is today accorded to a first-class, albeit slightly used, mobile home? The answer is easy. Practically new but slightly occupied, and hence "used" mobile homes cannot be equated against huge heavy equipment, most of which is ancient and its history as to maintenance unavailable or inadequate.

*Tillman* understood and appreciated that the doctrine of strict liability of a retailer (any retailer, here a bank) arises from the retailer's integral role in the overall producing and marketing enterprise, but insisted that such be supplemented by "some representation of quality," 596 P.2d at 1304, or some "special position vis-a-vis the original manufacturer or others in the chain of original distribution." *Id.* (citations omitted). There should be little doubt in anyone's mind that the Oregon Supreme Court would have been quick to agree that it was the bank who financed the mobile home that made it possible for the retailer to obtain the money to pay the manufacturer, and thus keep the stream of commerce rolling merrily along. For a better understanding of the important part played by a financing company, albeit in the context of travel trailers rather than mobile homes, see *Airstream, Inc. v. CIT Financial Services*, 111 Idaho 307, 723 P.2d 851 (1986), and *Airstream, Inc. v. CIT Financial Services*, 115 Idaho 569, 768 P.2d 1302 (1988).

The problem in today's majority opinion was most likely caused by relying on headnote 5 of *Tillman*, the first phrase of which states that a used goods dealer is *normally* entirely outside the original chain of distribution, which is not to say that West Publishing is at fault, because the opinion itself states somewhat the same:

> As to the risk-reduction aspect of strict products liability, the position of the used goods dealer is *normally entirely* outside the original chain of distribution of the product. As a consequence, we conclude any risk reduction which would be accomplished by imposing strict liability on the dealer in used goods would not be significant enough to justify taking that step.

*Tillman*, 596 P.2d at 1304 (emphasis added). Of course, in *Tillman* it does not appear that a bank had financed the transaction on the twenty-four year old crane, or that a bank was heavily involved in financing any ancient used heavy equipment, or that a bank generally ended up as owner/retail dealer after foreclosure proceedings. The reported Oregon and California

cases recite sales prices hardly needful of or entitled to financing—not when as is generally known, scrap iron sells for cash.

The facts and circumstances of the two scenarios, *Tillman* and this case, are poles apart. *Tillman* does contain some help, even inspiration, in being careful to observe that a used-goods dealer is *normally* out of the original chain. For certain it has no application in the Petersons' loss, and the bank's great gain. Those who comprise the majority are far too careless in considering the bank's involvement as being one *normally* out of the chain of distribution.[5] The bank was in the original chain as financier, and in short time it *was* the retailer of that merchandise which it formerly financed, and then in short order it was the seller.

All of which makes one appreciate the care with which *Tillman* confined its holding of no strict liability to cases where there was *no representation of quality;* and there was *no entity occupying a special position* in the chain of original distribution. The care taken by the *Tillman* opinion is a respectable example of judicial far-sightedness, which makes it all the more a pity that its display of caution is not contagious on exposure to all of its Idaho readers. In California, at least the *LaRosa* court was itself careful to repeat in *full* what the *Tillman* court had stated in qualifying its holding:

> [W]e have concluded that the relevant policy considerations do not justify imposing strict liability for defective products on dealers in used goods, *at least in the absence* of some representation of quality ... or of a special position vis-a-vis the original manufacturer or others in the chain of original distribution.

*LaRosa,* 176 Cal.Rptr. at 230, quoting with approval to *Tillman.* Were this Court to now appreciate *Tillman* for the narrowness of its non-liability holding, it would be hard put to deny the Petersons their constitutional right to take the case to a jury.

It is not considered necessary to engage Chief Justice Bakes in a discussion of Restatement § 402A. A conclusion in that regard need not be made at this time. Primarily, this office is concerned now that the Petersons not be turned out of court, as so far has been their lot on their other theories of liability. Suffice it to say that since this litigation commenced, and while finding its way to this Court, yet another neighboring state has been heard from. In *Thompson v. Rockford Mach. Tool Co.,* 744 P.2d 357 (Wash.App.1987), J. Ben McInturff, Chief Judge of the Third Division, Spokane, Washington, in writing for a unanimous court, first quoted approvingly from New Jersey's now time-tested opinion in *Turner v. International Harvester Co.,* 133 N.J.Super. 277, 336 A.2d 62 (1975), and specifically rejected Oregon's *Tillman* opinion. He does so in Restatement § 402A context, which, as mentioned earlier, is deserving of far more time and thought than is now available to us. Suffice it to say that in *Farmer v. International Harvester Company,* decided about the same time as the New Jersey *Turner* case, this court in an opinion authored by Justice Shepard, unanimous other than for one dissent without opinion, adopted the Restatement definition of defective condition in relationship to "unreasonably dangerous." 97 Idaho 742, 747, 553 P.2d 1306, 1312 (1976). *See also Shields v. Morton Chemical Co.,* 95 Idaho 674, 518 P.2d 857 (1974).

Midships in 1983 Arizona produced *Jordan v. Sunnyslope App. Prop. & Plumbing,* 660 P.2d 1236 (App.1983), which also expressed approval of *Turner,* and rejected *Tillman:*

> Admittedly, the relationship between a dealer in used products and the manufacturer is more attenuated than the relationship between the dealer in new products and the manufacturer. But we reject the view that the seller of used

---

5. The majority, somewhat blind-sidedly, simply strikes the word "normally" from the *Tillman* quotation. Likewise it strikes from mind "ab-sence of some representation of quality ... or of a special position."

**734**

goods is outside the chain of distribution. He offers the goods for sale and profits therefrom. Thus, he *is* an integral part of the marketing system.

*Jordan*, 660 P.2d at 1240 (emphasis added).

My oh my, how sweet it would be to have that Arizona court assess the situation which this Court reviews. The banker lends the necessary financing so that a retailer can buy wholesale and sell at retail, and then finances the sale at retail. The bank has foreclosed on over 1000 of its financed mobile homes, and has acquired them. The one mobile home involved here was only in Petersons possession for a short time before being repossessed and foreclosed, the bank being the new owner and the vendor. In Arizona, so I would surmise, the bank has at all times been an "integral part" in the chain of distribution, one way or another, or both. There is no doubting that the Oregon Supreme Court would likewise agree that the facts of this case clearly fall within the ambit of that Court's rule—stringent as it may be in comparison to New Jersey, Arizona, and Washington.