723 P.2d 851

**AIRSTREAM, INC.,**
**Plaintiff-respondent,**

v.

**CIT FINANCIAL SERVICES, INC.,**
**Defendant-appellant.**

**No. 16125.**

Supreme Court of Idaho.

July 15, 1986.

Joseph M. Meier of Clemons, Cosho & Humphrey, Boise, for appellant.

Jeffrey A. Strother of Moffatt, Thomas, Barrett & Blanton, Boise, for respondent.

BAKES, Justice.

CIT Financial Services, Inc. (CIT), appeals from the district court's finding that CIT is responsible to Airstream for payment of two checks drawn by an Airstream recreational vehicle dealer who had a flooring arrangement with CIT. We reverse and remand for additional findings.

This dispute arose from the following facts. Kirk Shuler, doing business as Wheels Unlimited, was a dealer in recreational vehicles which he purchased from Airstream. Shuler had an arrangement with CIT to finance his purchase of recreational vehicles. Under this arrangement, known as a "flooring agreement," CIT would pay Airstream for recreational vehicles ordered by Shuler and hold title to the units until Shuler sold them to his customers, during the interim charging Shuler interest on the amounts CIT paid.

However, not all vehicles purchased by Shuler were purchased under this flooring arrangement. Some vehicles were presold to the buyer or sent to Shuler c.o.d., and CIT would not be involved with financing these units.

In the spring of 1979 Shuler purchased two pre-sold travel trailers from Airstream, the first of these trailers for $15,704.84, the second for $21,711.50. Ultimately Airstream received two checks, drawn by Shuler, as payment for the trailers which also contained CIT's endorsement in blank on the back. When Airstream presented the checks to Idaho First National Bank for payment, the checks were dishonored. Subsequently, Airstream contacted CIT to demand that CIT cover the checks pursuant to its endorsement. CIT refused, claiming that the trailers had not been purchased under the flooring plan and that the company's endorsement on the checks was the result of a clerical error.

Airstream then filed suit against CIT, alleging that CIT was an accommodation party under I.C. § 28-3-415,[1] and also alleging breach of contract in CIT's failure to pay for the two travel trailers pursuant to the floor plan arrangement. The case was submitted to the district court on a written stipulation providing that the decision would be based on submitted depositions and attached exhibits. Subsequently, pursuant to I.R.C.P. 52(a), the district court issued findings of fact and conclusions of law finding CIT liable for payment on the checks, both as an accommodation party and under a contract theory. Airstream was also awarded interest from the date of dishonor, collection costs and attorney fees. CIT now appeals.

1. **28-3-415. Contract of accommodation party.**—(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

(2) When the instrument has been taken for value before it is due the accommodation party is liable in the capacity in which he has signed even though the taker knows of the accommodation.

(3) As against a holder in due course and without notice of the accommodation oral proof of the accommodation is not admissible to give the accommodation party the benefit of discharges dependent on his character as such. In other cases the accommodation character may be shown by oral proof.

(4) An endorsement which shows that it is not in the chain of title is notice of its accommodation character.

(5) An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party.

## I

The evidence consists exclusively of the depositions of employees of CIT, Airstream, and Kirk Shuler of Wheels Unlimited and exhibits which were submitted with the depositions. In his deposition, Shuler testified that Wheels Unlimited had a floor plan arrangement with CIT. Under this arrangement, CIT had to "pre-commit" to floor a vehicle. If CIT "pre-committed" to floor a vehicle, Wheels Unlimited would receive the vehicle and notify CIT of the receipt of the vehicle. CIT would then issue payment to the manufacturer in exchange for certain documents necessary for titling the units referred to as the manufacturer's statement of origin (MSO). CIT would retain the MSO's until payment was received from Wheels Unlimited, usually after the unit was sold to a customer.

Shuler also testified to a second method of purchasing trailers wherein he would receive vehicles c.o.d. directly from the manufacturer, giving the manufacturer his check upon delivery of a unit, and that CIT would not be involved.

According to Shuler, there was also a third method of purchasing units from a manufacturer. Under this method, the financing company would act as a go-between for the manufacturer and the dealer in a non-floored transaction, handling the exchange of the MSO which it would receive from the manufacturer and the check from the dealer. He stated that sometimes the check would be made out to the manufacturer, and sometimes to the finance company, in which case the finance company would then draft its own check and forward it to the manufacturer. This method of exchange, Shuler testified, was often used when the dealer was at his credit limit on the flooring plan and a pre-sold unit was ordered. Under this latter method, the dealer gained additional time before the manufacturer would deposit the dealer's check. During this time, the customer would take delivery of the unit and pay the dealer, thus enabling the dealer to "make good" on the payment to the manufacturer.

Shuler testified that in March and April of 1979, CIT had "frozen" Wheels Unlimited's floor plan because Wheels Unlimited had reached its flooring credit limit. Shuler stated that at that point in time he believed he was only ordering pre-sold units from the manufacturer. However, he did acknowledge that he may have ordered a unit or two to replace a stock unit which was sold.

Shuler remembered little about the specifics of the two transactions which led to this dispute. However, Shuler believed that, while these were not floored units, CIT had agreed to handle the exchange of paper work on these transactions, using the above mentioned third method of purchasing units. Shuler based this belief on the following: (1) that the two checks were drawn on his account, and not drawn by CIT; (2) that his floor plan was "frozen" at that time by CIT; and (3) that Shuler remembered two customers pre-selecting two units like the two units at issue here.

On cross examination, Shuler admitted that Airstream may not have authorized this third payment method, and that these transactions represent the only time this payment method was used to purchase an Airstream unit. Shuler also acknowledged that at the time of the purchase of these trailers he had an outstanding parts account payable with Airstream for over $30,000.

John Buzan, branch manager of CIT at the time of the transaction, testified in his deposition as to the flooring arrangement which existed between Wheels Unlimited and CIT. Buzan explained that under the flooring arrangement the manufacturer would contact CIT to determine if CIT would floor a particular item which had been ordered. If the dealer's flooring credit limit had not been exceeded, Buzan would confirm the order and send an approval confirming the flooring arrangement.

In this case, Buzan testified that he wrote "pre-sold" and "not to be floored" on

the CIT confirmation forms and mailed them to Airstream. (Copies of these confirmation forms are included as exhibits in the record.)[2] Buzan testified that, based upon the notations, which were in his handwriting, the units were pre-sold and not to be floored. Although Buzan admitted that other branches of CIT had floored pre-sold units before, he stated that his branch had never floored a pre-sold unit. He did, however, state that he had handled the paper work on some pre-sold units for dealers before. These units were generally paid for either with dealers' checks made payable solely to the manufacturer or by checks payable jointly to CIT and the manufacturer, in which case CIT would merely endorse the check and forward it to the manufacturer. He stated that he believed the dealers made some checks payable to both CIT and the manufacturer in order to keep their records straight. He also stated that CIT never endorsed such checks with the intent of guaranteeing payment on the check.

Buzan admitted that sometime after mailing the "confirmation forms" to Airstream, which stated that the units were not to be floored, he received invoices from Airstream on the two units. He stated that upon receipt of the Airstream invoices he telephoned Shuler and informed him that he had received the invoices. As far as the CIT endorsement on the back of Wheels Unlimited's check, Buzan testified that he would never have authorized such an endorsement because CIT was not listed as a payee on the check, and since the units had not been floored, CIT was not guaranteeing payment.

Kristin Haustveit, was also employed by the Boise office of CIT at the time of these transactions. Kristin admitted that she had stamped the CIT endorsement on the back of the checks. Although she did not recall the specifics of either transaction, she testified that it was her signature which appeared under the CIT endorse-

ment. She testified that she believed that the endorsement was a clerical error since she could not recall ever being instructed to place CIT's endorsement on any check on which CIT was not listed as a payee. She stated that she only had authority to place CIT's endorsement on dealers' checks which were made out to both CIT and the manufacturer before transmitting the check to the manufacturer.

Sharon Lescowitch, a former billing clerk at Airstream, also testified by deposition. She stated that all units were either floor planned or shipped c.o.d. She denied any knowledge of a third financing arrangement. Although Sharon's recall of these particular transactions was sketchy, she examined the shipping and billing instructions and acknowledged that she must have worked on the transactions, since some of the handwritten notations on the forms were in her handwriting. The shipping and billing instructions form is an internal Airstream document generated by a sales coordinator at the time an order is taken. (The record contains no testimony from the salesman who initially filled out these forms.) At the time when Sharon, as billing clerk, received the shipping and billing instructions for the first unit, it indicated that the unit was to be floor planned. However, written instructions next to this indication stated, "CIT tell them it's sold unit." From the record it is unclear who wrote these instructions since Sharon testified it was not her handwriting. The second unit's shipping and billing instructions form also indicated that the unit was to be floor planned. Handwritten instructions on this form stated, "CIT ask for John." Sharon stated that this instruction was not in her handwriting. Each of these forms also contained a second handwritten note in Sharon's handwriting which stated, "OK, John Buzan." Sharon testified that her own handwritten notes indicated that she

2. These printed CIT confirmation forms were designed to confirm a flooring authorization, and accordingly Buzan's handwritten notation that the units were "not to be floored" conflicted with the printed portion of the form. The handwritten terms in the documents control despite contrary printed terms contained in the form. I.C. § 29–109.

had called Buzan and received floor planning approval.

Sharon also identified two Airstream invoices that had been sent to CIT. After examining these invoices, she stated that these invoices sought payment from CIT under the floor plan. The office copies of these invoices had been stamped, and Sharon had written in John Buzan's name as authority for the floor plan approval. Sharon stated that, while she had no personal recollection of these transactions, in the usual course of business she would have called Buzan for his approval before making this notation. She stated that presold units were often floor planned.

Finally, Carl Ramga, Sharon's Airstream supervisor at the time of the transactions, testified that Airstream's standard operating procedure was to get a verbal commitment for financing before shipping a unit to a dealer. He identified the Airstream invoices sent to CIT as floor plan billings. He stated that while it was unusual to receive Wheels Unlimited's check rather than CIT's check in a floored transaction, he recalled seeing CIT's endorsement on the back of the check and had assumed the endorsement made CIT a party to the transaction. Ramga testified that he had never received a dealer's check made out to both Airstream and a finance company. Ramga also testified that he had not seen the CIT confirmations which Buzan testified that he mailed to Airstream which contained the notations "pre-sold" and "not to be floored."

The thrust of appellant's argument on appeal is that findings of the district court are clearly erroneous, particularly finding 8. Findings 7 and 8 state:

"7. Airstream mailed written confirmations of the March 30th contract and the April 5th contract to John Buzan the Branch Manager of CIT within a reasonable time after the contracts were formed. Buzan received those confirmations.

"8. *CIT gave Airstream no notice that it objected to the contents of the confirmations.*" (Emphasis added.)

Based upon the foregoing finding that "CIT gave Airstream no notice that it objected to the contents of the [Airstream] confirmations," the district court entered a conclusion of law that a contract existed under I.C. § 28–2–202 based upon the terms of Airstream's invoices. Appellant contends that this conclusion is erroneous because it is based on finding number 8 which it claims is contrary to the uncontradicted testimony and is thus clearly erroneous.

Before discussing CIT's argument that finding number 8 is contrary to the uncontested evidence, it should be noted that there is a serious question whether the sales article of the Uniform Commercial Code, and specifically I.C. § 28–2–202, relied on by the trial court, applies to this transaction. While admittedly the transaction between Airstream and Wheels Unlimited was an Article 2 sales transaction, CIT was not purchasing recreational vehicles from Airstream, and was not a "merchant" dealing in goods of the kind sold by Airstream. CIT was only a financing institution which had a contractual arrangement with Wheels Unlimited to finance its inventory of recreational vehicles. While its endorsement of the checks and forwarding them to Airstream falls within Article 3 of the U.C.C. dealing with commercial paper, the trial court's conclusion of law that a contract existed between Airstream and CIT under I.C. § 28–2–202, the sales article, is questionable. However, appellant has not objected to the trial court's application of Article 2 to the facts of this case, but rather has argued that even under 28–2–202 the trial court's conclusion that a contract existed is clearly erroneous because finding 8, upon which the conclusion is based, is contrary to the uncontradicted evidence in the case.

In support of this argument, appellant points specifically to the testimony of Buzan who described in detail that after he received a telephone call from Airstream he immediately filled out CIT's standard forms, writing on them "pre-sold" and "not to be floored," and mailed them to Airstream.

The district court's findings make no mention of Buzan's uncontradicted testimony that he mailed these CIT documents to Airstream, nor do the court's findings mention these documents, copies of which are contained in the record.

■ Our prior cases have held that courts must accept as true the positive uncontradicted testimony of credible witnesses, unless inherently improbable or rendered so by facts and circumstances disclosed at the trial. *Curtis v. DeAtley*, 104 Idaho 787, 663 P.2d 1089 (1983); *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979); *Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 74 P.2d 171 (1937). Such uncontradicted testimony may only be disregarded if the testimony's falsity is apparent "without any resort to inferences or deductions," *Curtis v. DeAtley, supra,* 104 Idaho at 790, 663 P.2d at 1092, *quoting Dinneen v. Finch,* 100 Idaho 620, 627, 603 P.2d 575, 582 (1979). The district court's apparent failure to consider Buzan's testimony concerning the mailing of these CIT documents to Airstream, while perhaps an oversight, undermines the district court's finding number 8 that "CIT gave Airstream no notice that it objected to the contents of the [Airstream] confirmations." Thus, the district court's factual findings that these transactions were financed by CIT under its flooring plan, and that CIT "gave Airstream no notice that it objected to the contents of the confirmations," are contrary to the evidence and are clearly erroneous. The CIT documents which Buzan testified that he mailed to Airstream expressly negated the use of the flooring plan arrangement regarding these transactions, and accordingly the district court's conclusion of law number 1 that "a contract existed on the terms of the invoices mailed to CIT confirming that CIT would finance the transaction between Wheels Unlimited and Airstream" is equally erroneous.

■ Airstream argues that the district court's conclusions that these transactions were financed under the floor plan and that CIT did not object to Airstream's invoices is supported by the testimony of the Airstream employees. Airstream cites to portions of the Airstream employees' depositions where each of the employees denies having ever seen the documents CIT alleges that it mailed. Assuming that Article 2 of the U.C.C. is applicable, I.C. § 28-1-201(26) and the cases interpreting it state that a party is deemed to have given notice once the notice is mailed. Whether it was received or noticed when received is immaterial. *Dougherty v. 425 Development Associates,* 93 A.D.2d 438, 462 N.Y.S.2d 851, 853 (N.Y.App.Div.1983); *Smith v. Butler,* 19 Md.App. 467, 311 A.2d 813, 816-17 (1973); *Hudspeth Motors, Inc. v. Wilkinson,* 238 Ark. 410, 382 S.W.2d 191 (1964). If Article 2 is not applicable, then ordinary contract law has a similar principle known as the "mailbox" rule. *See* 1 Corbin on Contracts, § 78 (1963). Accordingly, the testimony of the Airstream employees that they never saw the CIT memos which state that the units were "not to be floored" would not alter the rule that the documents are deemed received when mailed.

■ In this case, uncontroverted evidence in the record indicates that Buzan mailed documents which stated that the units were not to be floor planned. Thus, Buzan has given notice that the units were not to be floor planned, and the trial court's contrary finding is "clearly erroneous." Once Buzan gave this notice that the units were "not to be floored," no flooring contract existed between the parties because of the conflicting confirmatory memoranda. If Article 2 is applicable, and conflicting confirmatory memoranda exist, the trial court improperly relied on I.C. § 28-2-202. I.C. § 28-2-202 only applies where "[t]erms with respect to which the confirmatory memoranda of the parties agree ... are present." When the confirmatory memoranda do not agree, I.C. § 28-2-207 is applicable.[3] As stated in comment 6 to I.C. § 28-2-207,

3. **28-2-207. Additional terms in acceptance or**      **confirmation.**—(1) A definite and seasonable

"Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on what the confirmations agree, and terms supplied by this act, including subsection (2)."

Thus, when confirmatory memoranda conflict, other code sections must be consulted. I.C. § 28–1–205, for example, relating to course of dealing and usage of trade, could be relevant in resolving this dispute. However, the district court made no findings on these issues, and accordingly we must remand for additional findings on these issues and those described in Part II below. These additional findings may necessitate additional briefing by the parties.

## II

[4] Appellant also assigns as error the district court's conclusion that CIT became an accommodation party pursuant to I.C. § 28–3–415. As I.C. § 28–3–415 clearly states, "An accommodation party is one who signs the instrument in any capacity *for the purpose of lending his name* to another party to it." Thus, the question as to whether a party is an accommodation party depends on the signer's purpose in signing. *Farmers State Bank of Oakley*

*v. Cooper*, 227 Kan. 547, 608 P.2d 929, 934 (1980); *Fithian v. Jamar*, 286 Md. 161, 410 A.2d 569, 572 (1979). The question of purpose or intent is a factual question to be resolved by the trier of fact. *Godfrey State Bank v. Mundy*, 90 Ill.App.3d 142, 45 Ill.Dec. 549, 412 N.E.2d 1131, 1134 (1980). The district court's findings here do not address this issue either, and thus we remand for a finding as to CIT's intent in endorsing the Shuler check.

## III

[5] Lastly, appellant asserts that the district court erred in awarding Airstream collection costs and attorney fees pursuant to I.C. § 28–3–510A.[4] As even Airstream acknowledges, on its face I.C. § 28–3–510A only provides for collection costs and attorney fees to be assessed against the *drawer of an instrument.* As we have often stated, the clearly expressed language of the legislature must be given effect, and there is no occasion for construction where the language of the statute is unambiguous. *Ottesen on Behalf of Edwards v. Bd. of Comm'rs of Madison County*, 107 Idaho 1099, 1100, 695 P.2d 1238, 1239 (1985); *Worley Highway Dist. v. Kootenai County*, 98 Idaho 925, 928, 576 P.2d 206, 209 (1978). To read I.C. § 28–3–510A as providing for assessment of collection costs and attorney fees against accommodation parties, as well as drawers, would be to ignore the clear language of the Uniform Commercial Code adopted by the legislature. Under the U.C.C., the terms "drawer" and "endorser"

---

expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

    (a) the offer expressly limits acceptance to the terms of the offer;

    (b) they materially alter it; or

    (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

4. The district court's decision did not mention the applicability of I.C. § 12–120(2), and we make no comment on the applicability of that section.

are distinct words of art, have clear meanings, and cannot be used interchangeably. Accordingly, we reverse the district court's award of attorney fees and collection costs under I.C. § 28–3–510A.

Reversed and remanded for further proceedings. Costs to appellant.

DONALDSON, C.J., and BISTLINE, J., concur.

HUNTLEY, J., concurs in result.

McFADDEN, J. Pro Tem., dissents without opinion.