828 P.2d 821

**Helen L. TAYLOR, SSA 518 58 3858, Claimant-appellant,**

v.

**BURLEY CARE CENTER, Employer, and State of Idaho, Department of Employment, Respondents.**

No. 18355.

Supreme Court of Idaho, Twin Falls, Nov. 1990 Term.

Nov. 21, 1991.

Rehearing Dismissed Jan. 23, 1992.

Helen L. Taylor, Burley, pro se.

Lojek & Gabbert, Chartered, Boise, for respondent Burley Care Center. Donald W. Lojek argued.

Jim Jones, Atty. Gen., John C. Hummel, Deputy Atty. Gen., Boise, for respondent Dept. of Employment. John C. Hummel argued.

BAKES, Chief Justice.

Helen Taylor was fired from her employment with Burley Care Center. Her claim for unemployment benefits was denied on the ground that she was terminated for misconduct. She appealed, and after a hearing, the Department of Employment appeals examiner denied her claims for unemployment benefits. This decision was appealed to the Industrial Commission, which granted Taylor's request and remanded the matter for another hearing with the Department of Employment. Additional evidence was presented and received, following which the Department of Employment again denied benefits. On ap-

peal from this re-examination, the Industrial Commission adopted the decision of the Department hearing examiner, with minor factual modifications. Taylor appealed the Industrial Commission's decision and order to this Court.

The issue presented by this appeal is whether there is substantial competent evidence to support the Industrial Commission's finding that Taylor was discharged for misconduct. I.C. § 72–1366(e) provides that a claimant may not receive unemployment benefits if "[s]he was discharged for misconduct in connection with h[er] employment." Whether or not an action is "misconduct" is a question of fact to be determined by the Industrial Commission. *Spruell v. Allied Meadows Corp.*, 117 Idaho 277, 787 P.2d 263 (1990); *Booth v. City of Burley*, 99 Idaho 229, 580 P.2d 75 (1978).

In its decision and order, the Industrial Commission found that there was misconduct. The Commission adopted with minor modifications the findings of the appeals examiner who found the following.

Taylor worked as a charge nurse for Burley Care Center from September 17, 1984, until March 8, 1988. Taylor was supervised by the director of nursing who became dissatisfied with her work performance and attitude. A meeting was held on March 4, 1988, in which the dissatisfactions were discussed and Taylor was given a written warning. At that meeting, Taylor agreed to submit a written plan of correction by March 8, 1988. A meeting between Taylor and her supervisor was scheduled for March 8, 1988.

On March 8, 1988, Taylor arrived for the meeting accompanied by her sister, who was a nurse at a competitor facility. The supervisor explained it would not be appropriate to discuss the patients and their treatment in front of an outsider. The supervisor was willing to discuss Taylor's concerns with Taylor herself, review the documents, and reschedule a meeting with Taylor.

The supervisor and Taylor went to the administrator's office to discuss the situation. The administrator offered to schedule a meeting when she was available to sit down with Taylor and her supervisor to review the dispute. Taylor refused to attend any meeting without her sister present. The administrator reiterated that because of confidentiality, it was inappropriate to have an outsider at the meeting, especially one from a competitor business. Taylor argued that it was her right to have anyone with her, including her son, if she so desired. When Taylor again refused to discuss the situation with her supervisor and/or the administrator without her sister present, she was terminated.

The test for determining misconduct is first, whether the employee's conduct fell below the standard of behavior expected by the employer; and second, whether the employer's expectation was objectively reasonable in the particular case. *Matthews v. Bucyrus–Erie Co.*, 101 Idaho 657, 619 P.2d 1110 (1980). Based on evidence and the above test, the Commission adopted the appeals examiner's finding that:

> While the claimant may have had concerns about meeting with her supervisor alone, she had an obligation to discuss the matter with her supervisor or the administrator prior to the time of the scheduled meeting to make other arrangements. The claimant had the right to meet privately with the administrator but didn't avail herself of that right. The supervisor's concerns about protecting patients' confidentiality was real. Trying to have a meaningful discussion without discussing specifics of a patient would have been cumbersome if not impossible. The claimant did not act in good faith in trying to arrange for a witness who was acceptable to both parties. The requirement was on her to do so prior to the start of the meeting or to request rescheduling of the meeting. The claimant has not established that the administrator would have been an unreliable witness or that her distrust of going into the meeting without her sister was reasonable. The employer's expectation that the claimant meet with the supervisor and/or administrator to discuss the problems was reasonable. The claim-

ant's refusal to do so constitutes misconduct in connection with the employment.

 This Court's review of unemployment compensation cases involving factual disputes is restricted to determining whether the findings of fact by the Industrial Commission are supported by substantial and competent evidence in the record. Idaho Constitution, art. 5 § 9; I.C. § 72–732; *Spruell v. Allied Meadows Corp., supra.* We find that the Industrial Commission's determination is supported by substantial competent evidence. The order of the Industrial Commission denying unemployment insurance benefits is affirmed.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

Helen Taylor, a registered nurse who had been employed by Burley Care Center since September 17, 1984, was discharged from said employment on March 8, 1988. The examiner for the Department of Employment denied Taylor's claim for unemployment benefits based upon the examiner's conclusion that Taylor had been terminated for misconduct. On her *pro se* appeal and after a hearing before a Department of Employment appeals examiner Taylor was again denied any benefits. On her further *pro se* appeal to the Industrial Commission all that she obtained was another hearing in the Department of Employment. Additional evidence was presented and received, following which the Department of Employment again de-

nied all benefits. On her appeal from that determination, the Industrial Commission simply adopted the decision of the Department of Employment with minor factual modifications. The Industrial Commission's final decision and order left her with one option—an appeal to this Court. This Court is in the process of affirming the Commission by means of a succinct and quickly read opinion. The first part of the body of the Court's opinion purports to advise the reader of the findings of the appeals examiner, which the Commission adopted. The findings, which the majority opinion paraphrases, consist of four consecutive paragraphs.[1] Then follows the second part of the body of the opinion, wherein the majority, based on three Idaho cases which are not discussed, states the majority's test for determining misconduct and sets out the Commission's disposition, which is now reviewed. It is an unjust determination, and it is not soundly premised.

The issue presented by this appeal is whether Helen Taylor's polite insistence on the presence of an impartial third party during a meeting with her supervisors is capable of being termed misconduct as referred to in I.C. § 72–1366(e). That statute provides that a claimant may not receive unemployment benefits if "[s]he was discharged for misconduct in connection with h[er] employment." Thus, we are not concerned with the right of an employer to terminate an employee, but solely with the more narrow issue as to whether this ter-

---

1. The claimant worked as a charge nurse for Burley Care Center from September 17, 1984 until March 8, 1988. She worked 30 to 40 hours a week for which she received $7.29 an hour. The claimant was supervised by the director of nursing.

The supervisor was dissatisfied with the claimant's work performance and attitude. A meeting was held on March 4, 1988, in which the dissatisfactions were discussed and the claimant was given a written warning. At that meeting, the claimant agreed to submit a written plan of correction by March 8, 1988. A meeting between the claimant and her supervisor was scheduled for March 8, 1988.

On March 8, 1988, the claimant arrived for the meeting accompanied by her sister, who was a nurse at a competitor facility. The

claimant explained that she hadn't completed the plan of action because she had too many questions which needed to be discussed first. The claimant wanted to see the documentation in her files and review any written complaints. The claimant believed some of the facts in the written warning were incorrect.

The supervisor explained it would not be appropriate to discuss the patients and their treatment in front of an outsider. The supervisor was willing to discuss the claimant's concerns with the claimant herself, review the documents, and reschedule a meeting with the claimant. The claimant and her sister argued that it was the claimant's right to have anyone with her, including her son, if she so desired.

Decision of Appeals Examiner, May 8, 1989.

mination can be grounded upon misconduct.

As above stated, Taylor worked for the Burley Care Center as a nurse for four years of regular employment without criticism. A few days before she was terminated, she received a written warning from Arlene Jones, her immediate supervisor. The Burley Care Center requires an employee to respond to warnings by preparing and submitting a "plan of correction," which details how the employee will improve her performance. Taylor did not prepare a plan of correction, because she believed that the written warning contained false accusations. Taylor requested from Jones whatever documentation supported the accusations made against Taylor in the written warning. Taylor's sister, Carmen Adams, was present. Adams is also a nurse, and is familiar with patient documents, records, and hospital procedures. Prior to the meeting, Taylor had called the Department of Employment because of a fear that she was being set-up for termination by her immediate supervisor through the fabrication of undocumented accusations. She had been advised to bring a witness with her to the meeting.

Jones denied Taylor's request that Adams be present at the meeting. Jones based the denial on confidentiality of patient's records. Taylor responded that patient confidentiality would not have to be implicated by the presence of Adams; she suggested that patients could be referred to by number instead of by name. This offer was refused. Jones and Taylor together sought out Jody Craig Trujillo, the administrator and next in line up the chain of supervision. Trujillo suggested that she, Jones and Taylor meet and discuss the problem. Taylor again expressed her request that her sister, Carmen Adams, be present at the meeting. For that transgression, Taylor was immediately terminated notwithstanding almost four years with Burley Care Center.

Her application for unemployment benefits was denied on the ground of termination for misconduct. She timely pursued the matter, only to be rebuffed, all because of wanting the security of having a knowledgeable witness present at what might have been a non-hostile yet productive meeting. The Department of Employment appeals examiner rather summarily concluded that "[t]he employer's expectation that [Taylor] meet with her supervisor and/or administrator to discuss the problem was reasonable. The claimant's refusal to do so constitutes misconduct." Just how the examiner rationalized that it was unreasonable for Taylor to want the visible support of her sister while discussing her conduct with supervisory personnel is unknown and will forever remain unknown, and likewise unknown is the basis of the examiner's conclusion that employers' *expectation* that claimant would succumb to the proposed no-witness meeting *was* reasonable.

## THE DETERMINATION THAT AN EMPLOYEE WAS DISCHARGED FOR MISCONDUCT SHOULD BE GIVEN FREE REVIEW AS A MATTER OF LAW BY THIS COURT

The Industrial Commission's findings of fact will not be disturbed on appeal when they are supported by substantial competent evidence. *Davis v. Howard O. Miller Co.*, 107 Idaho 1092, 1094, 695 P.2d 1231, 1233 (1984). Over questions of law this Court exercises free review. *O'Loughlin v. Circle A Const.*, 112 Idaho 1048, 1051, 739 P.2d 347, 350 (1987).

This Court's conclusion as to what constitutes misconduct has not always reached the epitome of consistency. At times the standard of review used was that applied to questions of fact. At other times it has been a different standard. For example in *Davis*, this Court applied the standard of review for factual findings in determining what could constitute misconduct. It was there said that whether an employer's expectation was objectively reasonable (the second part of the *Kress/Matthews* test) "is essentially a question of fact for determination by the Commission." *Davis*, 107 Idaho at 1094, 695 P.2d at 1233.

However, in *Avery v. B & B Rental Toilets*, 97 Idaho 611, 614, 549 P.2d 270,

273 (1976), the Court stated that "the issue of whether insubordination is 'misconduct' within the purview of I.C. § 72–1366(e) is a question of law." In recognition of such contradictory definitions, a cautious court would utilize this opportunity to clarify the proper standard of review applicable in this type of controversy. Conceded, this Court does and should uphold the Commission's factual determination, provided that substantial competent evidence supports the same. But as to whether the facts found by the Industrial Commission mounted to the level of misconduct presents a question of law, allowing free review.

Without question one of the best, if not *the* best, appellate court decisions dealing with the Department of Employment's participation in making the determination as to whether the family of an unemployed laborer, be he or she the head of a family of two, three, or more, should be denied the perhaps life saving benefits provided by I.C. § 72–1366 is *Avery v. B & B Rental Toilets*, 97 Idaho 611, 549 P.2d 270 (1976). The opinion in that case was unanimous; there was no petition for rehearing. Chief Justice Bakes is the only member of the Court now sitting who also sat on the *Avery* case. Had I arrived on the Court a year earlier than I did, it would have been a bonus to have been in that majority. The *Avery* decision and opinion has not been questioned nor challenged in almost sixteen years. It has been cited and adhered to as recently as three years ago. *Swanson v. Idaho State Department of Employment*, 114 Idaho 607, 610, 759 P.2d 898, 901 (1988). The circumstances of that case, while not exactly identical to *Taylor v. Burley Care Center*, are not unduly dissimilar, and are readily available. Where in this case the claimant was denied benefits because of her alleged misconduct relative to her supervisor, Linda Swanson was turned away on the grounds that she resigned her position, which of all things, was with the Department of Health and Welfare, by whom she was assigned to the Bureau of Child Support. Her resignation was triggered by a state of mental depression and a disagreement with her supervisor. On reflection, she sought to rescind

her resignation and to return to work. The Commission went the route of the Department of Employment and ruled against Swanson.

This Court overturned the Commission, primarily relying on *Avery* and an earlier case, *Coates v. Bingham Mechanical & Metal Products Co. Inc.*, 96 Idaho 606, 533 P.2d 595 (1975). Although Justice Shepard was a solitary dissenting vote, he did not venture to furnish any reasons. The opinion was authored by Justice Donaldson, and concurring were Chief Justice McQuade, Justice Bakes, and District Judge Scoggins, Pro Tem. The essence of the *Coates* holding, and of the *Swanson* holding, and of the *Totorica v. Western Equipment Co.*, 88 Idaho 534, 401 P.2d 817 (1965), holding were to the effect that "absence from the job is not a leaving of work where the worker intends merely a temporary interruption in the employment relationship." *Totorica*, 88 Idaho at 542, 401 P.2d at 821.

In *Avery* the Commission made a specific finding "that the claimant was discharged for insubordination." 97 Idaho at 613, 549 P.2d at 272. Based in part thereon, it made the following conclusion of law:

A claimant for unemployment insurance benefits is ineligible if his unemployment is due to the fact that he was discharged for misconduct in connection with his employment. The Commission concludes that the claimant was discharged for misconduct in connection with his employment and is therefore ineligible for unemployment insurance benefits.

*Avery*, 97 Idaho at 613, 549 P.2d at 272. This Court's opinion reversed and remanded with directions to reconsider and redetermine in conformity with the Court's views expressed in the opinion. *Id.*, 97 Idaho at 615, 549 P.2d at 274. The opinion in part pertinent to that case and equally pertinent in Taylor's case, and required to be accorded *stare decisis* effect, provided:

Misconduct, which will disqualify a claimant from receiving employment benefits under the Employment Security Act, includes a disregard of standards of behavior which the employer has a right

to expect of his employee. While an employer has a right to expect that his employees will not engage in protracted argument after an order or directive is given to an employee, yet he cannot expect that his employees will at all times be absolutely docile or servile.

The findings of the Industrial Commission characterize appellant's conduct in the telephone conversation with his employer as not accepting the employer's explanation, expressing unhappiness and, according to his employer he 'blew his stack.' The expression used by the employer were 'blowing up' and 'blowing his cork.' These expressions are slang conclusions. The attitude or temperament of appellant in the conversation was as follows:

Q. What was the tone of his voice on the phone?

A. What was ...

Q. Was he yelling at you, or talking or ...?

A. He was very nervous, it was above average.

Q. How your wife fights with you sometimes?

A. Something like that.

The employer described appellant as a good worker, up to the time of the incident of appellant's firing. No evidence was introduced of other incidents of a similar nature prior to this one occurrence. There was no evidence that appellant used vulgar or abusive language during the conversation. In their relationship, neither the employer nor the employee had an intermediary.

The telephone conversation was initiated by the employee to report an unusual circumstance, as he had been instructed to do. In this instance, the circumstance was finding eight portable toilets in filthy condition, due to having been transported by the employer without first being emptied. The employer's failure to clean before transporting was the result of an equipment breakdown.

The employer so informed the employee. The conversation went into the job aspects and the employee's complaints.

The employer's standard of sensitivity or expectation was born with the occasion. The result reached by the Industrial Commission would require a standard of unswerving docility and servility. The law does not set such a standard. A single incident of comparatively nonserious disrespect by complaining and arguing is not misconduct. 76 Am.Jur.2d, Unemployment Compensation, § 52 and § 55 (1975); and annotation entitled 'Employee's Insubordination as Barring Unemployment Compensation,' 26 A.L.R.3d 1333 (1969).

In this case we are not concerned with the right of an employer to terminate an employment, but solely with the issue of whether the termination was for 'misconduct' within the purview of I.C. § 72–1366(e). Under the facts of this case, we hold that the employee's conduct which precipitated his discharge *did not as a matter of law constitute misconduct so as to render appellant ineligible for unemployment compensation benefits.*

*Avery,* 97 Idaho at 614–15, 549 P.2d at 273–74 (footnote omitted) (emphasis added).

With case precedent such as the *Avery, Swanson, and Coates* cases to guide it, no perceivable reason surfaces which serves to justify the Industrial Commission's decision which is not based upon what our predecessors wrote in those cases twenty to twenty-five years ago, or to justify the majority's aversion to applying case precedent here and now. *Stare decisis* is still alive and a rule of law. Three votes can do anything, but the Court nevertheless should not be so quick to disregard those three outstanding decisions in *Avery, Swanson,* and *Coates.* Chief Justice Bakes in particular is to be commended for having been a contributing force in helping guide the Commission and the Department of Employment back onto the path laid by the language of I.C. § 72–1302,[2] and the

---

2. **72–1302. Declaration of state public policy.**— ... Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. *Involuntary unemployment is therefore a subject of national and state interest and concern*

language of this Court written shortly thereafter in the cases of *In re Gem State Academy Bakery* and *Johns v. S.H. Kress & Co.*[3]

Free review of the question of whether certain facts constitute misconduct is consistent with our recent cases of *Hewson v. Asker's Thrift Shop*, 120 Idaho 164, 814 P.2d 424 (1991), and *Sprague v. Caldwell Trans. Inc.*, 116 Idaho 720, 722, 779 P.2d 395, 397 (1989). *Hewson* is so nearly akin to this case that it is deemed remarkable that any member of the Court who was in *Hewson* would reach a different result here. There, this Court reversed the determination of the Industrial Commission that a worker's refusal to attend a medical examination unless she could tape record the proceedings was an obstruction of the examination. There the Court did not hesitate in declaring itself *"not bound by conclusions of law drawn by the Industrial Commission."* *Hewson*, 120 Idaho at 166, 814 P.2d at 426 (emphasis added). In *Sprague*, the Industrial Commission found that the claimant had injured his back at work and had received medical treatment for the injury, but it concluded that part of the treatment was not "reasonable" and therefore the surety was not obliged to pay. We deferred to the Commission's factual findings as to the injury and course of treatment, but held that the question of whether the claimant had received "reasonable" medical treatment as required by I.C. § 72–432(1) was to be given free review because it was a question of law. Likewise, here, the Industrial Commission's finding that Taylor declined invitations to attend scheduled meetings with her supervisors without the presence of her sister cannot be reviewed by this Court, as that raises a question of fact. The question of whether the facts as found by the Industrial Commission mounted to the level of "misconduct" is a question of law which should be reviewed *de novo*. *See Booth v. City of Burley*, 99 Idaho 229, 233–34, 580 P.2d 75, 79–80 (1978) (Bistline, J., dissenting); and *Avery v. B & B Rental Toilets*, 97 Idaho 611, 549 P.2d 270 (1970).

## AN EMPLOYEE'S CONCERN ABOUT A MEETING WITH HER SUPERVISORS, WHO HAVE DENIED HER THE RIGHT TO BE ACCOMPANIED, IS NOT MISCONDUCT WITHIN THE PURVIEW OF I.C. § 72–1366(e).

Even were the question of whether misconduct has occurred considered one of fact, no misconduct occurred here. Burley Care Center argues that Carmen Adams' presence (for wholly undisclosed reasons) would have compromised the privacy rights of the patients at the Burley Care Center and accordingly contends that it was misconduct for Taylor to decline the invitation to go it alone. Taylor was not simply being

---

which requires appropriate action to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that, in its considered judgment, the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, and for the compulsory setting aside of unemployment reserves to be used for the benefits of persons unemployed through no fault of their own.
(Emphasis added.)

3. **Purpose of Act.** [Employment Security Law, I.C. § 72–1301.]

The purpose of this act is humanitarian, and it seeks the prevention of the economic ills arising out of unemployment and provides unemployment benefits to those unemployed through no fault of their own; to that end it should be liberally extended to all those who can be held to come within its purview. *In re Gem State Academy Bakery*, 70 Idaho 531, 224 P.2d 529 (1950).

The Employment Security Act is social legislation, designed to alleviate economic insecurity and to relieve hardships resulting from involuntary unemployment. It was intended to provide benefits for those unemployed under prescribed conditions who are willing and able to work but unable to secure a suitable employment on the labor market. *Johns v. S.H. Kress & Co.*, 78 Idaho 544, 307 P.2d 217 (1957).

obdurate, moreover, she has explained that, to the extent that her interactions with specific patients would be discussed, such could have been accomplished without mentioning names. Taylor at the time of the disagreement had earlier suggested referring to patients by number, but this suggestion was summarily rejected by Burley Care Center.

The Industrial Commission's decision does not even purport to divulge whether or not the employer would have been in violation of privacy laws had Adams had been present. Notwithstanding the Commission simplicised that "[t]he supervisor's concerns about protecting patients' privacy rights was real." That finding only begs the question. No one had questioned the integrity of the supervisor. No one, especially Helen Taylor and her sister, Carmen Adams, displayed any interest or desire to invade anyone's privacy to even the slightest degree.

Accordingly, absent a finding by the Industrial Commission that a genuine interest of the employer would have been harmed, misconduct as a basis for denying benefits is unrealistic and does a great injustice as well. Abundant and substantial case law supports the proposition that union employees may have their union representative present at certain meetings. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); *Robinson v. State Personnel Bd.*, 97 Cal.App.3d 994, 159 Cal.Rptr. 222 (1979). And, although non-union employees may not have an absolute right to in all circumstances have an impartial third party present at employer-employee meetings, it cannot be said that it was misconduct for Taylor to insist on a witness in the circumstances here present. The ink is hardly dry on our recent holding that an injured worker should have been allowed to tape record a medical examination, because it was not an "unreasonable obstruction" of the examination. It was noted there that "the Court makes it plain that there are many other instances in which the presence of a tape recorder or impartial advisor would not adversely affect the interaction and communication between an employer and its employees, and could only serve to enhance the resolution of misunderstandings and disputes." *Hewson*, 120 Idaho at 169, 814 P.2d at 429 (Bistline, J., specially concurring). That specially concurring opinion, in pertinent part, reads as follows:

In this day and age it would be considered un-American to require any citizen of these United States to submit to an examination of their body or mind by a person in the hire of an adverse party, whether individual or corporate, and who cannot be expected to be overly careful of the examinee's welfare and best interests. There is and can be no rational justification for examining any person as though that person is so much merchandise. It is a matter of common understanding among civilized persons that even the most sophisticated feel squeamish, unprotected, and at risk when being examined as to mind and body without being accompanied by a close friend or relative, and where those are unavailable, then by at least having the comfort of a tape recorder. Even the average high school student whom I have known always preferred to be accompanied by a friend when making a trip to the principal's office.

*Hewson v. Asker's Thrift Shop*, 120 Idaho at 169, 814 P.2d at 429.

Had the Industrial Commission found that Adams' presence would have been in violation of the patients' right to privacy, a different conclusion might be called for because the employer has an obligation to protect the privacy rights of its patients. *See, e.g., Idaho Department of Health and Welfare Regulations; Health Care Facilities*, IDAPA 16.02.2100,03.c.viii. But that simply is not the case here. When the employer is not able to postulate a legitimate reason for asserting that the presence of a witness would interfere with its supposed interests in protecting patient confidentiality, an employee's insistence that she be allowed to have a witness present does not rise to the level of misconduct.

The Commission should have determined whether and precisely in what manner

Adams' presence during the meeting would have in fact violated the patients' right to privacy. The Industrial Commission should have given serious consideration to Taylor's suggestion that patients be referred to by number. If that suggestion was not practicable for reasons not shown in the record, further consideration of alternative ways to protect the privacy rights of the patients should have been explored. Instead, all that has occurred is the Commission's and in turn the majority's unthinking acceptance of Burley Care Center's naked assertion that the appearance of a witness of Taylor's choice would somehow in some unknown manner be violative of patient privacy.

Moreover, two important facts are ignored by both the Commission and the majority. The first is that Taylor was acting in good-faith upon the advice given to her by the Department of Employment. The *undisputed evidence* is that Taylor called the Department and was advised to bring a witness along to the meeting.[4] The second is that Burley Care Center failed to comply with its own written policies before firing Taylor.

Thus assuming, *arguendo*, that patient confidentiality would have been breached by the presence of Adams and no cautionary measure could have been taken to avoid that from happening, the fact remains Taylor was not fired for refusing to discuss patients without the presence of her sister, who was also knowledgeable in matters relating to nursing, but rather for refusing to meet with Jones and Trujillo alone to discuss why Adams was there. Trujillo testified that, "I informed [Helen Taylor] that if she refused to discuss the situation with Arlene [Jones] and myself, it would be better to part company." Thus

the patient-confidentiality issue is seen for the red herring which it is.

Once that is recognized, it becomes manifest that Taylor was fired in violation of Burley's personnel manual. That document gives each employee the right to meet with the administrator, without the presence of the immediate supervisor, in case of a grievance:

> We recognize that when people work together, questions concerning their own welfare and fairness of treatment are certain to arise. It is our feeling that the relationship between you and your supervisor is a very important one; one that should be open enough to resolve most concerns or questions. Therefore, we urge you to initially contact your supervisor and discuss with him/her anything that is on your mind. Give him/her the first opportunity to resolve any questions or conflicts you may have. *Should you still feel the need for further discussion, you have the option of discussing the matter in private with the next level of supervision, up to and including the Administrator. If you are still not satisfied, arrangements will be made for a meeting with the Regional Manager. All efforts will be made to resolve problems in a fair and consistent manner.*

Employee Manual, Exh. 10C (emphasis added).

Trujillo frankly admitted she never gave Taylor this opportunity:

> EXAMINER: All right. The question to you was *when* did you give her the opportunity to speak directly with you with the supervisor?
>
> TRUJILLO: Okay. I didn't.

---

4. The long standing *Pierstorff v. Gray's Auto Shop* rule was recently cited in *Airstream v. CIT Financial Serv., Inc.,* 111 Idaho 307, 312, 723 P.2d 851, 856 (1986), per Bakes, J.:

Our prior cases have held that courts must accept as true the positive uncontradicted testimony of credible witnesses, unless inherently improbable or rendered so by facts and circumstances disclosed at trial. *Curtis v. DeAtley,* 104 Idaho 787, 663 P.2d 1089 (1983);

*Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979); *Pierstorff v. Gray's Auto Shop,* 58 Idaho 438, 74 P.2d 171 (1937). Such uncontradicted testimony may only be disregarded if the testimony may only be disregarded if the testimony's falsity is apparent 'without any resort to inferences or deductions,' *Curtis v. DeAtley, supra,* 104 Idaho at 790, 663 P.2d at 1092, *quoting Dinneen v. Finch,* 100 Idaho 620, 627, 603 P.2d 575, 582 (1979).

Taylor never had the opportunity to demand such a meeting with Trujillo before she was fired:

> EXAMINER: [W]hy didn't you have the opportunity to say you wanted to discuss it only with her?
>
> TAYLOR: Because she had already told me that if I would not meet with she and Arlene alone, I would have to consider my relationship with Burley Care Center terminated effective immediately. At that point, I said 'Jody, I cannot do that.' I felt very intimidated. The written warning alone is very intimidating and to have two supervisors behind closed doors ask me to meet with them, I don't feel I should have to do that. And I have been advised that I don't have to do that.

Taylor was dismissed before all efforts had been made to resolve the problem. She was never offered the opportunity to meet with the administrator, Jody Craig Trujillo, in private. Trujillo insisted that Taylor meet with both her and Taylor's immediate supervisor, Arlene Jones, in violation of the express terms of the employee manual. Further, Taylor was never offered the opportunity to meet with the regional manager, who may or may not have objected to Adam's presence.

It is unassailable that Taylor was guilty of nothing but wanting moral support on being directed to meet with her supervisors. Absolutely no one has stepped forward to explain why her request could not have been complied with. A fellow human being was in essence being asked to the woodshed by her superiors, and was perfectly willing to do so, other than for one small favor—she wanted her sister there with her. Her fellow human beings discharged her for making that request. She sought unemployment benefits in order to get by while pursuing new employment, but again fellow human beings found her guilty of misconduct. What, exactly, was the conduct which rose to the level of misfeasance?

In sum, the majority today denies unemployment benefits to a woman who was fired in violation of the employer's written policies, accomplished upon the baseless assumption that patient privacy would be violated by the presence of a witness who was brought to the meeting in good-faith reliance upon the advice given by a state agency. The majority's decision is unjust and contrary to the law.